23942

The STATE, Respondent v. James Michael CHARPING, Appellant.
(437 S.E. (2d) 88)

Supreme Court

*Chief Appellate Defender Daniel T. Stacey,* of the *South Carolina Office of Appellate Defense,* Columbia, *for appellant.*

*Attorney General T. Travis Medlock, Chief Deputy Atty. Gen. Donald J. Zelenka, Criminal Appeals Section Chief Harold M. Coombs, Jr., Asst. Atty. Gen. William Edgar Salter, III,* Columbia, and *Sol. Donald V. Myers,* of the *Eleventh Judicial Circuit, for respondent.*

Heard, Dec. 7, 1993.

Decided, Oct. 11, 1993. Reh. Den. Nov. 17, 1993.

HARWELL, Chief Justice:

James Michael Charping (Charping) appeals from the convictions and death sentence he received for his alleged role in the brutal rape and murder of Joann Pruitt (Pruitt). We reverse.

## I. *FACTS*

Late on the evening of February 1, 1990, Charping, Jeffrey Whitlock, and John Thoman (Thoman) drove Pruitt to an isolated pond in Lexington County where she was raped, severely beaten, and drowned. At 1:21 a.m. on February 2, Thoman reported Pruitt's murder by telephone from his home and told police that Charping and Whitlock were returning to the scene to conceal Pruitt's body. Acting on Thoman's information, police arrested Charping and Whitlock at the pond. A jury convicted Charping of conspiracy, kidnapping, first-degree criminal sexual conduct, and murder and sentenced him to death. Charping appealed.

## II. *DISCUSSION*

Charping contends that the trial judge erred by failing to obtain a knowing and voluntary waiver of his right to make the final argument to the jury in the guilt phase. We agree.

S.C. Code Ann. § 16-3-28 (Supp. 1991) provides:

> Notwithstanding any other provision of law, in any criminal trial where the maximum penalty is death or in a separate sentencing proceeding following such trial, the *defendant and his counsel* shall have the right to make the last argument. (Emphasis added.)

The 1986 amendment to section 16-3-28, which substituted "defendant and his counsel" for "defendant or his counsel," clearly indicates that the legislature intended for capital defendants to have a personal right to make the last argument in both phases of their trials. As with other constitutional and statutory rights, we have held that a waiver of the right granted by section 16-3-28 must be knowingly and voluntarily made on the record. *See State v. Orr*, 304 S.C. 185, 403 S.E. (2d) 623 (1991) (knowing and voluntary waiver of the right to last argument must be satisfied by a full record); *State v. Reed*, 293 S.C. 515, 362 S.E. (2d) 13 (1987) (denial of a defendant's right to make a final argument is reversible error absent a knowing and voluntary waiver of the right on the record). The State concedes that there was no such waiver in this case. Accordingly, we reverse Charping's murder convic-

tion and remand his case for a new trial.[1] Our ruling makes it unnecessary for us to address Charping's remaining exceptions.

Charping's convictions for kidnapping, first-degree criminal sexual conduct, and conspiracy are unaffected by trial errors raised for the first time on appeal and, therefore, are affirmed. *State v. Williams,* 303 S.C. 410, 401 S.E. (2d) 168 (1991).

Affirmed in part, reversed in part, and remanded.

CHANDLER, FINNEY, JJ., concur.

GOOLSBY, Acting Associate Justice, and TOAL, J., concurring in part and dissenting in part in separate opinion.

GOOLSBY, Acting Associate Justice (concurring in part and dissenting in part):

I concur in the majority's affirmance of James Michael Charping's convictions and sentences for kidnapping, criminal sexual conduct in the first degree, and criminal conspiracy. I respectfully dissent from the majority's reversal of Charping's conviction for capital murder and of his death sentence. I do not think the mere failure of the record to reflect a waiver by Charping of his statutory right to make a personal, closing jury argument during the guilt-determination phase of his trial for capital murder and other offenses warrants a reversal of his murder conviction and death sentence. It certainly does not warrant an automatic one.

The Lexington County Grand Jury indicted James Michael Charping and Jeffrey Whitlock for the murder of Joann D. Pruitt. The indictment also charged the two with kidnapping, criminal sexual conduct in the first degree, and criminal con-

---

[1] *In favorem vitae* review requires this Court to search the trial record for legal errors even though not properly preserved for appeal. *State v. Torrence,* 305 S.C. 45, 406 S.E. (2d) 315 (1991). Under *in favorem vitae* review, the omission of an on-the-record knowing and intelligent waiver of the right to address the jury at the close of the guilt phase mandates reversal. *State v. Rocheville,* 425 S.E. (2d) 32 (1993).

The dissent urges us to find the error harmless or to remand the case for a factual determination of waiver. Error is harmless only when it could not reasonably have affected the result of the trial. *State v. Reeves,* 301 S.C. 191, 391 S.E. (2d) 241 (1990). We have stated that speculation as to whether an appellant was prejudiced by being denied his right to final argument is inappropriate. *Reed,* 293 S.C. at 518, 362 S.E. (2d) at 14. Moreover, it is clear that the waiver must be made on the record. *Orr,* 304 S.C. at 188, 403 S.E. (2d) at 624.

spiracy. Following a pretrial hearing the trial court severed Charping's case from Whitlock's.

A jury trial conducted on April 22 through April 29, 1991, resulted in Charping's being found guilty on all the charges alleged in the indictment. After a sentencing proceeding, the jury recommended Charping be sentenced to death. The jury specifically found Joann's murder was accompanied by aggravating circumstances, namely, kidnapping, criminal sexual conduct, and physical torture. The trial judge followed the jury's recommendation and sentenced Charping to death for murder. He also sentenced Charping to thirty years imprisonment for criminal sexual conduct and five years imprisonment for criminal conspiracy.

The issues on appeal arise out of both the guilt-determination and the sentence-determination phases of the trial. Those that arise out of the guilt-determination phase concern Charping's right to make a personal, closing jury argument; the trial judge's charge on circumstantial evidence; the trial judge's charge on expert testimony; and the admission of certain testimony challenged as hearsay. Those that arise out of the sentence-determination phase concern the curative measures taken by the trial judge after learning that jurors had read a certain news article; the solicitor's closing jury argument; the failure of the trial judge specifically to charge the jury, either orally or in writing, certain non-statutory mitigating circumstances; the failure of the trial judge to charge the jury that its findings of mitigation need not be unanimous; the use of the offense of kidnapping as an aggravating circumstance; the failure of the trial judge to charge the jury that the State must prove Charping's specific intent to establish any statutory aggravating circumstance; the trial judge's charge on expert testimony; and the admission of certain photographs challenged as inflammatory. The issues on appeal also include the question of whether the cumulative impact of the asserted errors requires a reversal of Charping's convictions and of his sentences.

The evidence given at trial tells of awful, terrible crimes committed by Charping against Joann Pruitt. To describe her rape and murder as merely brutal is an understatement. The State relied heavily on the eyewitness account provided by John Thoman in his testimony. It also relied on the testimony

of Vanessa Thoman, Charping's girlfriend and John Thoman's sister.

On February 1, 1990, shortly after 5:30 p.m., Thoman joined Vanessa, Charping, and Jeffrey Whitlock in Charping's trailer where Charping lived with Vanessa and Whitlock. Thoman began drinking beer. Charping and Whitlock were drinking vodka.

Later on, Thoman asked Whitlock if he knew where Thoman could buy some marijuana. After Whitlock made a couple of telephone calls, he found someone who agreed to help them.

Thoman, Whitlock, and Charping left the trailer to pick up the person around 8:30 p.m. After stopping briefly at a gasoline station, they drove into Richland County to a house where they picked up Joann Pruitt. The four then went to a trailer in Lexington County where Joann, leaving the men in the car, entered the trailer and bought a quarter ounce of marijuana from Barbara Crabtree. She gave the marijuana to Thoman.

A little while later, they stopped at a Texaco station. Thoman and Whitlock went inside and bought rolling papers for the marijuana.

When they came back outside, Joann was inside the car. Charping stood by the car and pointed down through its roof at Joann. He said in a low tone, "Hey, man, I'm going to kill this bitch."

With Charping driving, the four left the station and got onto Interstate-26. Shortly afterward, Charping said the car was acting up and he was going by his parents' home in Gaston to get some oil. Joann told him to hurry because she had to get home.

Charping, however, drove past the exit that led to his parents' home and got off at another exit. He drove to a pond located off a dirt road in an isolated, wooded area of rural Lexington County.

Charping and Whitlock got out of the automobile, purportedly to urinate. They talked for several minutes and returned to the car.

Charping told Thoman to get out of the car. Before he could get out, however, Charping hit Joann and pulled her from the car. When Joann asked him why he had struck her, Charping

answered by striking her three or four more times.

Charping took Joann a short distance into the woods, returning with her a little while later. Joann was begging to go home. Charping, however, told her "to chill out."

Eventually, Charping asked Joann if she would have sexual relations with all three of them. When she refused and said she was not that kind of girl, Charping struck her in the head with his fist, almost knocking her down. Charping then grabbed her, stood her up, and hit her three or more times.

Charping next took Joann back into the woods, telling Thoman and Whitlock of his intention to rape her.

Thoman and Whitlock remained at the car. Over the next twenty-five minutes, they occasionally heard Charping raise his voice, cursing Joann.

Charping later called for Whitlock and Thoman to join him in the woods. Whitlock went immediately, but Thoman stayed a few more minutes at the car. When he finally walked to where Charping and Whitlock had Joann, he saw she was on her hands and knees. She was nude, except for her socks.

Whitlock had his pants down, was on his knees, and was claiming to be having anal sex with her. All the while, Charping was exhorting Whitlock in a loud voice and was beating Joann with his hands and kicking her. Joann was moaning and crying.

Thoman left the woods briefly and returned just as Whitlock was getting up. Joann lay helplessly on her side as Charping stood cursing her.

Charping soon began kicking Joann and beating her again. Meanwhile, Whitlock grabbed a four-inch round stick or log and starting beating Joann with it. As they beat her, Joann covered her head with her hands and tried to protect herself.

The beating lasted about five minutes.

Afterward, Charping forced Joann to get up. He pushed her farther into the woods where he and Whitlock once more beat and kicked her, this time more violently.

Joann's beating and kicking was followed by Charping's choking her and attempting to snap her neck with his hands.

When his efforts to snap Joann's neck failed, Charping placed a log across her neck. While atop her, Charping tried for several minutes to strangle her with the log. As this was occurring, Whitlock put a handful of dirt in Joann's face and

put a large stick between Joann's legs, moving it back and forth near her vagina.

Charping finally got off Joann, complaining that she would not die and referring to her as a "bitch." He wanted to cut her, but no one had a knife.

Charping then asked Joann how she liked being raped and how she wanted to die. Joann did not respond, other than to make a gurgling sound.

A minute or so later, Charping told Joann to get up and walk to the pond nearby. She could not get up. She began begging Charping not to kill her. Ignoring her pleas, Charping took Joann's arm, pulled her to her feet, and walked her toward the pond.

As Joann approached the pond, Charping and Whitlock struck her legs and back with large sticks. Each used both hands as he swung his stick.

When they reached the pond's edge, Charping dropped his stick and pushed Joann into the water. He went in behind her and held her head under water. She kicked for about three minutes. Charping held her under the water until he was satisfied she was dead.

Charping then grabbed Joann by the hair and pulled her back to shore. There, Charping and Whitlock covered her nude body with pine straw, leaves, and other debris. They picked up Joann's clothes and took them to the car; Whitlock put the clothes into the trunk.

The three men went to Charping's home and they "all grabbed a beer out of the refrigerator."

Thoman left, went to his trailer next door, and told his fiancee about the murder. He went back outside and saw Whitlock as he got Joann's clothes out of the trunk. Thoman persuaded Whitlock to give the clothes to him. He called the police a short time later and reported the murder.

Vanessa Thoman testified that Charping arrived home at around 1:15 a.m. and told her he had killed a "girl." She went with Charping and Whitlock back to the pond to "bury the body."

When they located Joann's nude, pine straw-covered body, Vanessa asked Charping for a lighter so she could see to attempt cardiopulmonary resuscitation. Charping told Vanessa, "[I]f [she] brought her back[,] he would kill her again," and

"[I]f you scream, bitch, I will kill you[,] too." Vanessa testified she asked Charping "how he could do something like that to somebody. . . ." Charping, she testified, "looked at me, and he said life was a bitch."

A forensic expert testified Joann's body had been "badly battered, badly bruised, [and] multiply cut," had "multiple hemorrhages," and had been "extensively traumatized." She had large bruises over her forehead. Two bruises on the forehead had "imprint-type marks . . . that would fit perfectly with the middle three fingers of a fist. . . ." She also had bruises over her eyes and on her jaw. Half of Joann's face was severely swollen and her left jaw was distorted. Her left ear was completely bruised. She had deep lacerations in the scalp that cut through to her skull. One laceration contained pine bark debris. There was bleeding from her nose and mouth. Joann's neck was flattened, puffy, and swollen and had very dark, linear bruises. Her larynx had been crushed. There were bruises and scratches on her upper chest and large bruises on her middle-upper back. There was also a large abrasion on her left shoulder that was so severe her skin was cut off. Her arms had bruises, as did the backs of her hands. The condition of Joann's vagina indicated recent sexual activity had taken place. There as also vaginal bleeding that resulted from an abrasion "more likely to have been caused by a blunt object[,] such as a stick or a club. . . ." Joann's lungs exhibited pulmonary edema and her trachea held a watery-type mucus.

The expert testified all these injuries were inflicted before Joann died.

Lexington County sheriff's deputies found Joann's body after they arrested Charping and Whitlock at the scene based on information given them by Thoman. A search of Charping's trailer following his arrest produced Charping's wet clothing. The officers got Joann's clothing from Thoman when they responded to his call.

I.

Charping argues the trial judge committed reversible error in failing to secure an on-the-record waiver of his right, under S.C. Code Ann. § 16-3-28 (Supp. 1991), to make a personal, closing argument to the jury in the guilt-determination phase of the trial. The majority agrees and reverses Charping's

murder conviction, relying on *State v. Reed*, 293 S.C. 515, 362 S.E. (2d) 13 (1987), *overruled on other grounds by State v. Torrence*, 305 S.C. 45, 406 S.E. (2d) 315 (1991) and on *State v. Orr*, 304 S.C. 185, 403 S.E. (2d) 623 (1991), and finding that the State had conceded there was no knowing and voluntary waiver made on the record by Charping of the right given him by section 16-3-28.

I would find, however, Charping suffered no prejudice whatever from any failure not to have been allowed to argue personally to the jury during the guilt-determination phase of trial; and before I would vacate Charping's judgment and sentence, I would at least remand the issue of waiver to the trial court for a determination of whether Charping in fact knowingly and intelligently waived the right in question despite the failure of the record to reflect that he did so.

The State concedes only "there was no on-the-record waiver of [Charping's] right to personally address the jury by way of the last closing argument, in the guilt phase." It neither concedes Charping was prejudiced by the failure of the record to reflect a knowing and intelligent waiver of this statutory right nor concedes Charping did not knowingly and intelligently waive it.

This issue is raised for the very first time on appeal. Charping never advanced to the trial judge the argument he now makes. The court accords the issue appellate review only because Charping's case, which was tried before the date of this court's opinion in *State v. Torrence*, 305 S.C. 45, 406 S.E. (2d) 315 (1991), qualifies for *in favorem vitae* review.

*In favorem vitae* review is simply an exception to the rule requiring an error to be properly preserved before the error can receive appellate review. *See Drayton v. Evatt*, — S.C. —, —, 430 S.E. (2d) 517, 519 (1993) (*"In favorem vitae* review requires us to painstakingly inspect capital cases to determine whether prejudicial error has been committed in a trial, irrespective of whether an assignment of error has been made by the defendant.") (emphasis added); *Torrence, supra* at 60-61, 406 S.E. (2d) at 324 ("This doctrine requires this Court to review the entire record for legal error, and assume error when unobjected to but technically improper arguments, evidence, jury charges, *etc.* are asserted by the defendant on appeal in a demand for reversal or a new trial.").

## A.

Assuming for the moment the worst possible case for the State, that Charping did not in fact knowingly and intelligently waive his right to make a personal, closing argument to the jury during the guilt-determination phase of trial, the error is at most harmless and therefore not reversible.

Charping testified in his own defense at trial. He claimed he became so intoxicated on February 1, 1990, he did not remember what happened after he, Whitlock, and Thoman stopped at a store to buy beer and gasoline. He said the next thing he remembered was waking up in jail. At no point in his testimony did he deny he had kidnapped, sexually assaulted, and murdered Joann Pruitt. Instead, he said simply he had blacked out because of alcohol consumption and, as a result, did not remember what had happened. He allowed, however, it was possible that he had committed the crimes charged against him.

One of Charping's two attorneys did make a closing argument to the jury during the guilt-determination phase of trial. The attorney, Kenneth M. Suggs, Esquire, a well-known and highly regarded trial lawyer, attacked Thoman's credibility and questioned the sufficiency of the evidence to prove Charping's guilt beyond a reasonable doubt. He also brought to the jury's attention every conceivable weakness, every inconsistency, and every discrepancy that he saw in the State's case. Indeed, Charping voices no complaint whatsoever about the argument Suggs made for him and even now offers no suggestion of things that Suggs should have argued to the jury on his behalf.

Considering the evidence outlined above, Charping's own sworn statements to the jury in the form of testimony and his lawyer's closing argument, there is no reasonable possibility that the failure of Charping to make a personal, closing argument to the jury during the guilt-determination phase of his trial contributed to his conviction. *See Chapman v. California*, 386 U.S. 18, 24, 87 S.Ct. 824, 828, 17 L.Ed. (2d) 705, 710 (1967) (wherein the United States Supreme Court prescribed the test for harmless error to be whether it appears "beyond a reasonable doubt that the error complained of did not contribute to the verdict obtained."); *see also Rose v. Clark*, 478 U.S. 570, 577-79, 106 S.Ct. 3101, 3105-06, 92 L.Ed. (2d) 460, 470-71 (1986) (wherein the United States Supreme Court,

after noting a constitutional error involving a complete denial of counsel, a use of a coerced confession, or an adjudication by a biased adjudicator was not subject to the harmless-error doctrine, stated, "[I]f the defendant had counsel and was tried by an impartial adjudicator, there is a strong presumption that any other errors that may have occurred are subject to harmless-error analysis.").

Neither *Reed* nor *Orr* prevents this court from applying the harmless-error rule to the purported error here.

In *Reed*, the issue was not the issue that is involved in the instant case. For this reason alone, *Reed* is not controlling. In the *Reed* case, the defendant argued "the trial judge erred in allowing the State to have the closing argument in the guilt phase of his trial." *Reed*, 293 S.C. at 517, 362 S.E. (2d) at 14. This court agreed, holding the record "[was] devoid of evidence appellant made a knowing and intelligent waiver of [his] right [to final argument]." *Id.* at 517-18, 362 S.E. (2d) at 14. The court refused to speculate on whether the defendant had been prejudiced, saying it would be "inappropriate in *this* situation. . . ." *Id.* at 518, 362 S.E. (2d) at 14 (emphasis added). "This situation" was one in which the *order* or *sequence* of argument was in issue and not one in which, as here, the question was whether the defendant had waived his right to make a personal, closing argument.

In *Orr*, the defendant, a person with an I.Q. of between 53 and 59, did not testify and did not exercise his right to make a personal, closing argument to the jury at either phase of his trial. The record in *Orr*, unlike the record here, affirmatively showed the defendant neither knowingly and voluntarily waived his right to testify nor knowingly and intelligently waived his right to make a personal, closing argument during the guilt- and sentence-determination phases of the trial. The court did not discuss harmless error and, under the circumstances of that case with the record showing what it did, it is doubtful that the doctrine could have been properly applied.

Here, there is evidence that Charping, a navy veteran, possessed an I.Q. of 107. Here, the record shows Charping testified. Here, the record shows the State made the first closing argument and Charping's lawyer made the last closing argument at both the guilt- and sentence-determination phases of his trial. Here, the record shows Charping knowingly and in-

telligently waived his right to make a personal, last argument to the jury during the sentence-determination phase. The record here, unlike *Reed* and *Orr*, lends itself to a harmless-error analysis.

Two other points about harmless error.

The doctrine is no stranger to death penalty cases. *Cf. Yates v. Evatt*, — U.S. —, —, 111 St.Ct. 1884, 1892, 114 L.Ed. (2d) 432, 448 (1991) (wherein the United States Supreme Court acknowledged the appropriateness of applying a harmless-error analysis to a jury instruction given in a death penalty case).

*In favorem vitae* review, despite this court's suggestion to the contrary in footnote 1 of the majority's opinion in the instant case, does not preclude a harmless-error analysis. *Cf., e.g., State v. Damon*, 285 S.C. 125, 328 S.E. (2d) 628 (a death penalty case in which the court applied a harmless-error analysis in granting an *in favorem vitae* review of the trial court's instructions on a statutory aggravating circumstance), *cert. denied*, 474 U.S. 865, 106 S.Ct. 187, 88 L.Ed. (2d) 156 (1985) *and overruled on other grounds by Torrence, supra; State v. Johnson*, 236 S.C. 207, 113 S.E. (2d) 540 (1960) (a death penalty case in which the court applied a harmless-error analysis in granting a review of the trial court's failure to instruct the jury relative to the appellant's confession where the appellant made no request for the instructions), *overruled on other grounds by Torrence, supra*. No case of which I am aware actually *holds* a harmless-error analysis is unavailable where *in favorem vitae* review is granted. This court, when conducting an *in favorem vitae* review, traditionally only looked for "prejudicial error." *See Drayton, supra* at —, 430 S.E. (2d) at 519; *see eg. State v. Riddle*, 291 S.C. 232, 235, 353 S.E. (2d) 138, 140 (1987) ("Under the doctrine of *in favorem viate*[,] we have a duty to search the record for prejudicial error committed *by the trial court.*"), *overruled on other grounds by Torrence, supra; State v. Boone*, 228 S.C. 438, 447, 90 S.E. (2d) 640, 644 (1955) ("[I]n keeping with our invariable rule of *in favorem vitae*, ... [we] have combed the record for prejudicial error, disregarding whether or not it may have been made the basis of exception of question."), *overruled on other grounds by Torrence, supra*. A harmless error, by definition, is an error that is not prejudicial. *See McCoy Farms*,

*Inc. v. J & M McKee,* 263 Ark. 20, 563 S.W. (2d) 409, 413 ("Error unaccompanied by prejudice, commonly called harmless error, is not [a] ground for reversal."), *cert. denied,* 439 U.S. 862, 99 S.Ct. 184, 58 L.Ed. (2d) 171 (1978); 5A C.J.S. *Appeal & Error* § 1676, at 678 (1958) ("[H]armless error, that is, error as such, unaccompanied by prejudice or injury, is not ground for reversal.").

### B.

Assuming a harmless-error analysis is for some reason inappropriate here, I would remand the case to the trial court for a determination "on-the-record" of whether Charping did, in fact, effectively waive his statutory right to make a personal, closing argument to the jury during the guilt-determination phase of his trial.

Neither *Reed* nor *Orr* would preclude a remand under the circumstances of this case.

Again, at issue in *Reed* was the order or sequence of argument and not, as here, the question of whether the defendant had waived his right to make a personal, closing argument. Again, the record contained no suggestion that the appellant effectively waived this right.

Unlike *Reed,* the existing record in this case cannot fairly be said to be devoid of any suggestion that Charping made a knowing and intelligent waiver of his right to make a personal, last closing argument during the guilt-determination phase of his trial. To the contrary, the existing record all but cries out for an inquiry into the question of his waiver of this statutory right in that it demonstrates competence of counsel at every turn and suggests the active participation by Charping in his defense.

Furthermore, the court in *Reed* never considered the issue of remand.

As noted above, the record in *Orr* affirmatively disclosed an absence of a knowing and intelligent waiver by a defendant of both his right to testify in his own defense and his right to make a personal, closing argument during both phases of his death penalty trial. Here, as we mentioned, Charping testified and effectively waived his right to make a personal, last argument to the jury during the sentence-determination phase.

An additional reason why neither *Reed* nor *Orr* precludes a

remand of this case is because neither *Reed* nor *Orr* held the *only* way that a knowing and intelligent waiver of a defendant's right to make a personal, closing jury argument can be established is by the record made then and there at trial. A bright-line rule like that would nor further justice and would make little, if any, sense. Any number of things can happen in the course of a death penalty trial, which quite often is not only an expensive endeavor but a long, complicated undertaking, that can derail even the very best of trial judges from the sometimes arduous task of making sure that everything that occurred is reflected "on the record." Trial judges, being human, can simply forget to have something put down or they can be diverted from doing so due to the press of events or due to other reasons too numerous to mention here. A death penalty trial is not a contest that calls for a knee-jerk imposition of the ultimate penalty of reversal whenever a trial judge commits an infraction. Where the record does not show, as here, whether a certain event either did or did not occur, there ought to be some sensible method that can be employed to determine whether in fact it did take place. *See Vickery v. State*, 258 S.C. 33, 186 S.E. (2d) 827 (1972) (the failure of the trial court to make an affirmative showing on the record that a plea of guilty was voluntarily and intelligently entered was held harmless beyond a reasonable doubt where the record developed at a postconviction hearing disclosed the plea of guilty was voluntarily and intelligently entered).

At least one other court has allowed a limited remand in a capital case for a determination of whether a state-created, nonconstitutional right was violated. That court is the Supreme Court of Georgia, a state whose death penalty statute is very much like our own. *Compare* Ga. Code Ann. § 17-10-30 *et seq.* (1990) and S.C. Code Ann. § 16-3-20 *et seq.* (1985 & Supp. 1991).

In *Christenson v. State*, 261 Ga. 80, 402 S.E. (2d) *cert. denied,* — U.S. —, 112 S.Ct. 166, 116 L.Ed. (2d) 130 (1991), the court remanded a death sentence for a determination of whether the prosecutor could support by admissible evidence questions that he addressed on cross-examination to the defendant's mitigation witnesses about seventeen alleged prior felony crimes committed by the defendant. The State had not notified the defendant, as required by the Georgia death

penalty statute, that it would use evidence of those crimes as evidence in aggravation during the sentence-determination phase of the trial and the defendant had objected to the prosecutor's questions about the non-noticed offenses. The prosecutor, in violation of the rule established in *State v. Clark*, 258 Ga. 464, 369 S.E. (2d) 900 (1988), had asked the questions without demonstrating that they were asked in good faith and were based on reliable information that could be supported by admissible evidence.

This court, too, has ordered limited remands in criminal cases, including murder and capital cases. *See e.g., State v. Blair*, 275 S.C. 529, 273 S.E. (2d) 536 (1981) (wherein the court remanded a murder conviction for a determination of whether the defendant was incompetent to stand trial); *State v. Fortner*, 266 S.C. 223, 222 S.E. (2d) 508 (1976) (wherein the court, because the trial judge failed to conduct a proper hearing on the voluntariness of the defendant's confession, remanded a conviction for housebreaking and grand larceny pursuant to *Jackson v. Denno*, 378 U.S. 368, 84 S.Ct. 1774, 12 L.Ed. (2d) 908 (1964)); *State v. Callahan*, 263 S.C. 35, 208 S.E. (2d) 284 (1974) (wherein the court, because the trial judge failed to make specific findings regarding whether a confession had been tainted by use of articles illegally obtained, remanded convictions of burglary, rape, and robbery for a determination of whether the defendant's confession was voluntary), *cert. denied*, 420 U.S. 981, 95 S.Ct. 1411, 43 L.Ed. (2d) 663 (1975); *State v. Curley*, 253 S.C. 513, 171 S.E. (2d) 699 (wherein the court, because the trial judge failed to make an independent determination of whether the warnings required by *Miranda v. Arizona*, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed. (2d) 694 (1966), had been given the defendant and whether his privilege against self-incrimination had been voluntarily and intelligently waived, remanded a safecracking conviction for appropriate findings), *cert. denied*, 400 U.S. 834, 91 S.Ct. 69, 27 L.Ed. (2d), 66, *and cert. denied*, 400 U.S. 834, 91 S.Ct. 70, 27 L.Ed. (2d) 66 (1970); *State v. Hamilton*, 251 S.C. 1, 159 S.E. (2d) 607 (1968) (wherein the court remanded a murder conviction for a determination of whether probable cause for the defendant's arrest that would justify a search made incident thereto existed at the time of arrest); *State v. Cannon*, 248 S.C. 506, 151 S.E. (2d) 752 (1966) (a capital case wherein the court remanded a rape

conviction for an independent determination of the voluntariness of the defendant's confession), *overruled on other grounds by State v. Torrence,* 305 S.C. 45, 406 S.E. (2d) 315 (1991); *cf. State v. Victor,* 300 S.C. 220, 387 S.E. (2d) 248 (1989) (wherein the court, distinguishing *Fortner, Callahan,* and *Cannon,* held a remand for a suppression hearing was inappropriate "because the *jury* never considered the issue of voluntariness as required by state law."). In fact, these cases, and others like them, establish the precedent, ignored by the majority, that makes necessary, even in a capital case, a remand of an issue that the trial judge, as opposed to the jury, was required to decide where the record shows the trial judge failed to decide the issue and the record does not affirmatively show a remand would be inappropriate. The court's action here undermines the continuing validity of that procedure, if not outright overrules those cases that permitted its use.

The federal constitutional right against self-incrimination, which provided the basis for the complaints made in *Fortner, Callahan, Cannon* and *Curley,* and the federal constitutional right to be free of unreasonable searches and seizures, which provided the basis for the complaint made in *Hamilton,* seem to me, on the scale of things, to be far more important and far more sacrosanct than the state statutory right of a defendant to make a personal, closing argument in a death penalty case in addition to the closing argument made by the defendant's lawyer. *See Malloy v. Hogan,* 378 U.S. 1, 84 S.Ct. 1489, 12 L.Ed. (2d) 653 (1964) (the Fifth Amendment's right against self-incrimination is applicable to the States); *Monroe v. Pape,* 365 U.S. 167, 81 S.Ct. 473, 5 L.Ed. (2d) 492 (1961) (the Fourth Amendment's prohibition against unreasonable searches and seizures is applicable to the States). If a remand can be ordered for a determination of whether a defendant voluntarily and knowingly waived his federal constitutional right against self-incrimination or his federal constitutional right to be free of unreasonable searches and seizures, I see no good reason why a remand cannot also be ordered for a determination of whether a defendant knowingly and intelligently waived his statutory right to make a personal, closing jury argument.

Before I would reverse Charping's murder conviction and death sentence, then, I would at least have the trial judge determine for certain whether Charping knowingly and intelli-

gently waived his right to make a personal, closing argument to the jury during the guilt-determination phase of his trial. If the trial judge, after a hearing, found he did not do so, the conviction and sentence would be reversed; and if he found he did effectively waive the right, the murder conviction and death sentence would stand. *See, e.g., Hamilton,* 251 S.C. at 7, 159 S.E. (2d) at 610. Judicial economy, without any prejudice to this defendant, would support such an action.

## II.

Charping argues the trial judge committed reversible error during the guilt-determination phase in instructing the jury on the use of circumstantial evidence.[1] He argues language in the instruction equated reasonable doubt with moral certainty and shifted the burden of proof by requiring the jury to find a reasonable explanation of the circumstantial evidence inconsistent with his guilt before it could find him not guilty. These arguments, which were never offered to the trial judge, have no merit.

## A.

Charping points to *Cage v. Louisiana,* 498 U.S. 39, 111 S.Ct. 328, 112 L.Ed. (2d) 339 (1990), and *State v. Manning,* 305 S.C. 413, 409 S.E. (2d) 372 (1991), *cert. denied,* — U.S. —, 112

---

[1] The challenged jury instruction stated:

You are instructed further, ladies and gentlemen, that a crime may be proved by direct evidence, or by circumstantial evidence, or by both. By direct evidence of a fact is meant the testimony of persons who have perceived its existence by means of their senses. It's where a person sees a crime committed, and comes into court and testifies as to what he saw.

By indirect or circumstantial evidence is meant the proof of some other fact or facts from which, taken either singly or collectively, the existence of the particular fact in question may be inferred as a necessary consequence. . . .

To the extent that the state may rely on any circumstantial evidence it must prove all off [sic] of the circumstances relied on beyond a reasonable doubt. They must be wholly, and in every particular perfectly consistent with one another, and they must point conclusively, that is, to a moral certainty to the guilt of the accused, to the exclusion of every other reasonable hypothesis; that is, they must be absolutely inconsistent with any other reasonable hypothesis than the guilt of the accused. In other words, ladies and gentlemen, in the consideration of any circumstantial evidence, if any there be, the jury must seek some reasonable explanation thereof other than the guilt of the accused, and if such reasonable explanation can be found they [sic] cannot convict on such evidence.

S.Ct. 1282, 117 L.Ed. (2d) 507 (1992), which found reasonable doubt instructions lessening the constitutional burden of proof improper, and asserts they are controlling. I disagree.

In *Cage*, the United States Supreme Court found a jury instruction defining "reasonable doubt" constitutionally defective because it equated "reasonable doubt" with "actual substantial doubt," "grave uncertainty," and "moral certainty," thereby suggesting a higher degree of doubt than is required for acquittal under the "reasonable doubt" standard.

This court followed *Cage* in *Manning*, noting that "[t]he use of a moral certainty standard rises to the level of a constitutional violation when it is combined with other terms in the judge's charge which 'suggest a higher degree of doubt than is required for acquittal under the reasonable doubt standard.' " 305 S.C. at 416, 409 S.E. (2d) at 374; *See also State v. Johnson,* 306 S.C. 119, 410 S.E. (2d) 547 (1991) (the trial judge's definition of reasonable doubt as a "substantial doubt" was not reversible error because the term was not used in combination with a reference to "moral certainty"), *cert. denied,* — U.S. —, 112 St.Ct. 1691, 118 L.Ed. (2d) 404 (1992).

The challenged instruction, however, is not at all like the instructions condemned in *Cage* and *Manning*. It does not use the term "moral certainty" in combination with the term "substantial doubt" or with the term "grave uncertainty" or with any other similar term.

Furthermore, unlike the instructions in *Cage* and *Manning*, the one here dealt only with the standard to be applied by the jury when considering the *circumstantial* evidence that the State was relying on to convict the defendant. The charge did not relate to the overall standard that the jury was to use to determine the defendant's guilt or innocence. In point of fact, Charping does not attack, as did the defendants in *Cage* and *Manning*, the trial judge's explanation of the burden of proof that the trial judge told the jury that it had to use to find him guilty.

## B.

I do not agree with Charping's argument, to quote from his brief, that "the charge given in [this] case turn[ed] the [S]tate's burden of proof on its head by requiring the jury to find a 'reasonable explanation' of the evidence inconsistent

with [Charping's] guilt before it [could] find him not guilty."
Charping relies on *Manning* to support this argument.

In *Manning*, this court said the following charge impermissibly shifted the State's burden:

> I would instruct you to seek some reasonable explanation of the circumstances proven other than the guilt of the defendant and *if such a reasonable explanation can be found you would find the Defendant not guilty....* (Emphasis added.)

305 S.C. at 416-17, 409 S.E. (2d) at 374. Here, however, the questioned charge reads:

> [I]n the consideration of any circumstantial evidence, ... the jury must seek some reasonable explanation thereof other than the guilt of the accused, and if such reasonable explanation can be found they [sic] *cannot convict* on such evidence.

The distinction between the two charges, although subtle, should not be overlooked.

The *Manning* charge instructed the jury that it could find the defendant not guilty only if there was a reasonable explanation of the circumstantial evidence other than the defendant's guilt. Thus, the jury may have believed it could not acquit the defendant in the absence of a reasonable explanation. The instruction, therefore, narrowly limited the jury's ability to acquit because it foreclosed all other avenues by which the jury could find the defendant not guilty.

The instruction given here, however, did not so limit the jury's ability to acquit. Read plainly, the charge prohibited conviction if a reasonable explanation other than the defendant's guilt was found. Unlike *Manning*, the charge did not require the jury to find a reasonable explanation of the circumstantial evidence to find Charping not guilty. In the absence of a reasonable explanation, the jury was not limited in its ability to acquit. The charge, then, did not "turn the State's burden on its head."

In any case, Charping must show there is a "reasonable likelihood" that the jury applied the challenged instruction in a way that violated the Constitution. *See Boyde v. California*, 494 U.S. 370, 110 S.Ct. 1190, 108 L.Ed. (2d) 316 (1990)

(wherein the United States Supreme Court adopted a "reasonable likelihood" standard for considering the constitutionality of jury instructions used in a capital sentencing hearing); *see also Estelle v. McGuire*, — U.S. —, 112 S.Ct. 475, 116 L.Ed. (2d) 385 (1991) (wherein the United States Supreme Court stated the "reasonable likelihood" standard is the single standard for reviewing jury instructions for constitutional error). He has not met this burden. In my view, there is no reasonable likelihood that the jury applied the questioned instruction in such a way that altered or shifted the State's burden of proof, given the context of other instructions.[2] *See Boyde*, 494 U.S. at 380, 110 S.Ct. at 1198, 108 L.Ed. (2d) at 329 ("[T]he proper inquiry ... is whether there is a reasonable likelihood that the jury has applied the challenged instruction in a way that prevents the consideration of constitutionally relevant evidence.").

A reasonable interpretation of the charge is that, in its consideration of circumstantial evidence, the jury was to convict only if there was no "reasonable doubt," that is, it found no "reasonable explanation," other than that Charping was guilty of the crimes of which he was accused.

---

[2] Before charging the jury regarding circumstantial evidence, the trial judge instructed the jury regarding reasonable doubt. Charping levels no criticism about that instruction, an instruction I now quote:

> The indictments that I have just read to you contain the charges or the allegations against the defendant, but the indictments themselves are not evidence in the case. To these indictments the defendant has entered pleas of not guilty. Now, those pleas of not guilty cast a burden upon the State of South Carolina to prove the defendant guilty. A person charged with committing a criminal offense under our law is never required to prove himself or herself innocent.
>
> You are instructed that it is an important rule of the law of evidence that the defendant in a criminal trial will always be presumed to be innocent of the crime for which he is indicted until his guilt has been proven by evidence satisfying you of that guilt beyond a reasonable doubt. This presumption of innocence is a substantial right to which everyone is entitled, and it accompanies a defendant from the time of his arrest, throughout the trial, and until you, the jury, have reached a verdict of guilt based upon evidence satisfying you of that guilt beyond a reasonable doubt.
>
> I charge you that the defendant is entitled to any reasonable doubt arising in the whole case, or arising on any defense presented by him. If upon the whole case you have a reasonable doubt as to the guilt of the defendant he is entitled to that doubt, and would be entitled to an acquittal.

The trial judge thereafter used the phrase "reasonable doubt" several more times without defining term.

## III.

Charping argues, also for the first time on appeal, he was prejudiced by the trial judge's instruction on expert testimony during the guilt-determination phase because the instruction omitted telling the jurors that they could consider the opinion of an expert witness in arriving at their decision. This argument has no merit whatever.

During the guilt-determination phase, Charping presented expert testimony that his blood-alcohol level was between 0.30 and 0.40 near the time of the murder. This testimony related to Charping's physical capacity to commit the acts attributed to him on the night in question and served to bolster his claim that he was too drunk to remember what had occurred.

The trial judge instructed the jury:

> In this case certain expert and scientific evidence has been introduced. You are instructed that such testimony and evidence must be weighed and considered by you just as any other testimony which has been presented.

This instruction did not prohibit the jury's consideration of an expert witness's opinion. Any opinion given by an expert witness was necessarily embraced within the expert witness's "testimony and evidence" and thus, under the trial judge's charge, opened for consideration by the jury.

## IV.

Charping argues the trial court erroneously admitted during the guilt-determination phase a statement that described him as being "drunk and obnoxious" shortly before the murder. He challenges the statement on the ground of hearsay. I see no reversible error in its admission.

The statement, which was attributed by the witness Barbara Crabtree to Joann, described the persons with Joann when Joann went to buy marijuana as being "drunk and obnoxious." These persons were not identified.

And even assuming he was identified as one of those persons with her, Charping was not prejudiced by its admission given his defense was based on his high level of intoxication, his resulting loss of memory, and the inference that he was physically unable to commit the alleged acts. *See State v.*

*Smith,* 230 S.C. 164, 94 S.E. (2d) 886 (1956) (an accused must be prejudiced by the admission of hearsay in order to be entitled to a reversal).

## V.

Charping argues the trial judge erred by refusing, just before the penalty-determination phase of the trial began, to grant a mistrial or to question each juror individually outside the presence of the others after publication of a newspaper article discussing the impact of a convicted murderer's numerous appeals and ultimate execution on the family of his victims and near-victims. The article contained no information about the Charping case. No error occurred.

Five jurors saw the article. Three simply noted the headline and two read the entire article.

When a prejudicial newspaper article is brought to the attention of a trial judge, the judge must inquire as to whether any juror has seen the article and invoke appropriate curative measures if a juror has done so. *State v. Salters,* 273 S.C. 501, 257 S.E. (2d) 502 (1979). Where a trial judge determines a juror who has read the article is able to decide the case based only on the evidence presented, any prejudice created by the article is cured. *State v. Wasson,* 299 S.C. 508, 386 S.E. (2d) 255 (1989).

Of the five jurors who in response to the trial judge's inquiry about the article disclosed they had seen it, none indicated, when questioned by the trial judge, an inability to serve as a juror in the penalty-determination phase of Charping's trial because of what the juror had seen or read.

In addition to the inquiries made by the trial judge about the article, the trial judge gave a curative charge at the close of the penalty-determination phase that instructed the jury to consider "only the evidence and the testimony that has been presented in this courtroom, and not anything that you may have read or seen outside of this courtroom."

Any prejudice Charping may have suffered by the jurors' having seen the article, therefore, was cured by the judge's inquiries and instructions. *Cf. Wasson,* 299 S.C. at 511, 386 S.E. (2d) at 256-57 (wherein the court held the trial judge satisfied his duty to insure the jury's impartiality after two jurors read a newspaper article discussing the defendant's alleged extra-

neous crime and summarizing trial testimony where the judge questioned the jury about the article and about the effect it had on the jurors and the jurors who read the article stated it did not affect their decision).

## VI.

Charping argues the solicitor committed several reversible errors during his closing argument in the sentence-determination phase.

## A.

Charping argues the solicitor's comparison of the sentences for murder, attempted murder, burglary, and armed robbery appealed to the passions or prejudices of the jurors and violated the Eighth Amendment to the United States Constitution and Article I, § 15 of the South Carolina Constitution by introducing an arbitrary factor into the jury's deliberation. I disagree.

The solicitor's "proportionality" argument did no more than attempt to show that the circumstances of this case warranted a death sentence. The argument did not impermissibly appeal to the passions and prejudices of jurors and it did not introduce an arbitrary factor into the jury's deliberations.

## B.

Charping argues the solicitor's argument during the sentence-determination phase that evidence that Charping said he was going "to kill that bitch" and that he later struck Joann was "uncontradicted" constituted an impermissible comment on Charping's failure to testify during the sentence-determination phase. I disagree.

Charping, in making this argument, ignores the fact that the jury had before it his testimony, which he gave during the guilt-determination phase, that he did not remember the events surrounding Joann Pruitt's murder and that he possible could have done the things attributed to him. The jury in the sentence-determination phase of a death penalty trial is not precluded from giving consideration to the matters heard on the issue of guilt or innocence. *Eberheart v. State,* 232 Ga. 247, 206 S.E. (2d) 12 (1974), *sentence vacated on other grounds,* 433 U.S. 917, 97 S.Ct. 2994, 53 L.Ed. (2d) 1104 (1977), *and modified,* 238 S.E. (2d) 1 (Ga. 1977); *see* S.C. Code Ann.

§ 16-3-20(B) (Supp. 1991) ("In the sentencing proceeding, the jury ... shall hear *additional* evidence in extenuation, mitigation, or aggravation of the punishment." (Emphasis mine.)) The prosecutor is likewise not precluded from commenting about such matters during sentencing-phase argument.

Defense counsel, I might add, placed great emphasis during their arguments during the sentence-determination phase on Charping's guilt-phase testimony that he could not remember what had happened.

## C.

Charping argues the solicitor's closing argument was improper because it invited the jury to consider his failure to confess. I disagree.

During Charping's guilt-phase testimony, he stated he could not remember Joann Pruitt's murder due to intoxication. Later, during the penalty-determination phase, Charping presented testimony from a minister with whom he had held discussions after Joann's murder. The minister, while discussing Charping's character, testified he and Charping "talked about confessions, and ... got to the point where we [sic] felt forgiveness. . . ."

Subsequently, one of Charping's lawyers during her penalty-determination-phase opening argument urged the jury to believe that Charping had told the truth when he testified during the guilt-determination phase that he did not remember "what happened that night." She told the jury:

> We didn't put up any lies. We didn't try to lie to you in our case. I wish that Michael could remember what happened that night. I wish that he could have gotten up on that stand and told you, "No, I didn't do it. [John] did it, or Jeff did, or somebody else did it, but I didn't do it," but he just doesn't remember. . . . We didn't lie to you. We told you the truth.

The solicitor thereafter, in responding to the opening argument of Charping's lawyer, picked up on the minister's testimony when he focused on the credibility of Charping's claim that he could not remember what had occurred on the night Joann was murdered.

And I want you to remember the reverend, another hon-

est person. After listening he started going to the jail and talking with Michael Charping, and what were the two things that he said that they finally resolved? Confession and forgiveness. That is him talking to his preacher. Confession and forgiveness. Mike Charping is knowing this is coming up. Confession his preacher says, and forgiveness, *but he can't remember anything, folks. He blacked out, and, of course, they are not trying to pull any wool over your eyes. They aren't trying to cover up or distort any facts. . . .* (Emphasis mine.)

The solicitor's argument was not aimed at Charping's failure to confess. *Cf. State v. Diddlemeyer,* 296 S.C. 235, 371 S.E. (2d) 793 (1988) (wherein the Supreme Court reversed a defendant's conviction and death sentence where the solicitor impermissibly referred to defendant's lack of remorse), *overruled on other grounds by State v. Torrence,* 305 S.C. 45, 406 S.E. (2d) 315 (1991). It was directed elsewhere—to Charping's credibility.

## D.

Charping argues the solicitor went outside the record when he commented on a prior psychological assessment of Charping. I disagree.

During the penalty-determination phase of trial, Charping introduced testimony from Dr. Judith Koontz, a child psychiatrist. Koontz testified she had contact in 1984 with Charping at the Menninger Foundation, a psychiatric institution, when he was seventeen years old. She saw him after he had participated in a break-in and theft of computer equipment. (Another defense witness, a clinical social worker, volunteered Charping "was charged . . . with being involved with a robbery" of a convenience store in 1988 and was placed in a pre-trial intervention program.)

In a letter about Charping's stay at Menninger, Koontz discussed several causes of Charping's difficulties. She wrote "team members were struck by the fact that Mike has made it as far as he has without having been in more serious difficulty. . . ."

Koontz testified Charping was then diagnosed as having a conduct disorder, "undersocialized, aggressive," the essential feature of which, as she described it, was "[a] repetitive and

persistent pattern of conduct in which either the basic rights of others, or major age appropriate societal norms or rules are violated." Other principal characteristics of the disorder are a readiness to manipulate others, a lack of concern for the feelings and well-being of others, a general absence of guilt or remorse, and a tendency to place blame on others. A person with this disorder may resort to physical violence, she testified.

Koontz further testified one reason that Charping had not been diagnosed in 1984 as having an anti-social personality disorder was because, at age seventeen, he was too young.

She admitted she was concerned about Charping not receiving treatment for his disorder before he got into more serious difficulty.

Charping, who did not object at trial to the solicitor's argument, now targets the solicitor's remarks about Koontz and others at Menninger being "shocked" that Charping at age seventeen had not already killed or committed another violent crime when they saw him.

A solicitor's final argument in the penalty-determination phase of a capital trial must be tailored so as not to appeal to the personal bias of a juror and must not be calculated to arouse his passion or prejudice. The argument must be confined to the record and its reasonable inferences and the argument must center on the characteristics of the defendant and the nature of the crime. *State v. Reed*, 293 S.C. 515, 362 S.E. (2d) 13 (1987). The solicitor satisfied this standard in his argument. His assertion that those who evaluated Charping when he was seventeen were shocked that he had not already killed or committed another violent crime was well within the evidence that "[Menninger Foundation] team members were struck by the fact that Mike has made it as far as he has without having been in more serious difficulty. . . ."

Furthermore, his remarks, appearing more fully in the footnote below,[3] were expressly directed to the statutory-mitigat-

---

[3] The solicitor argued:

What else is the judge going to submit to you as he is required to do by law, and they are relying on? The defendant has no significant history of prior violence, and they want you to consider his age. What did this lady here say? Seventeen years old, seventeen years old. How was he diagnosed? Physical, aggressive behavior, and you remember this was

ing circumstance, contained in S.C. Code Ann. § 16-3-20(C)(b)(1) (Supp. 1991) and charged by the trial judge, that "[t]he defendant has no significant history of prior criminal conviction involving the use of violence against another person." They were also directed at the testimony given by a social worker that Charping would respond to placement in a structured environment for a long period of time.

## VII.

Charping argues the trial judge diminished the importance of certain non-statutory mitigating circumstances in the eyes of the jury and thereby violated the Eighth Amendment by refusing his request to submit to the jury during the penalty-determination phase these non-statutory mitigating circumstances either orally or in writing. I think not.

The Death Penalty Act requires the trial judge to instruct the jury to consider "any mitigating circumstances otherwise authorized or allowed by law" in addition to any of several statutory mitigating circumstances "which may be supported by the evidence." S.C. Code Ann. § 16-3-20(C) (Supp. 1991).

In response to a complaint in *State v. Linder*, 276 S.C. 304, 311, 278 S.E. (2d) 335, 339 (1981), about "the trial judge's charge and written instructions dealing with mitigating circumstances," this court chose to "discuss the mitigating cir-

---

brought out, and the only reason Mrs. Koontz couldn't even make a worse diagnosis is that he wasn't quite yet 18 at the time. He was about four months before he could be 18, and under that rule they have got to wait till he was 18. And what else did they say? We are shocked that this 17 year old has not already committed a serious crime at that time. . . . [I]f you want to give it consideration that he has no significant history of prior violence as far as others, you give that consideration that you deem appropriate. This lady here said . . . 17 years old—I think it was 1985—this person is physically aggressive towards others and property. We said, now, ma'am, somebody fitting under that classification could be a raper, could be a murderer? And what did she say? She said, no, not everybody who is diagnosed that will be a raper or murderer [sic], but every raper and murderer fits in that category. They are telling you what's going to happen to this fellow at 17 years old. He's going to kill. They are shocked that he hasn't already done so. . . .

. . . They brought that out, and right on up to 17 where those people said, we are shocked he hadn't committed a violent crime. He's a ticking time bomb walking around. He's a time bomb. It is just a matter of time before he's going to release that and explode. It will take years to cure that, years, and they want you to think in a structured environment we can treat him. . . .

cumstances generally so as to provide guidance for the retrial of the [case]." After discussion of *Lockett v. Ohio*, 438 U.S. 586, 98 S.Ct. 2954, 57 L.Ed. (2d) 973 (1978), the court stated:

> Since the statutorily listed mitigating circumstances are not exclusive, the statutory instructions as to aggravating and mitigating circumstances given to the jury must not imply that only the statutory mitigating factors may be considered. Although *the jury must be told that they may consider "any mitigating circumstances . . ."* this does not require that they be given to the jury in writing as is required for the statutory mitigating circumstances.

276 S.C. at 311-12, 278 S.E. (2d) at 339 (emphasis mine). Note that the court did not say the non-statutory mitigating circumstances must be specifically charged orally. The clear suggestion from the underscored language is that, unlike our sister state of North Carolina, non-statutory mitigating circumstances need not be so submitted. *See State v. Johnson*, 298 N.C. 47, 257 S.E. (2d) 597 (1979) (wherein the court interpreted North Carolina's death penalty law as requiring all mitigating circumstances, both those expressly mentioned and others, to be submitted to the jury upon the defendant's timely request).

Here, the trial judge's charge, despite the absence of a specific mention of non-statutory mitigating circumstances, was entirely consistent with *Lockett v. Ohio*, 438 U.S. 586, 608, 98 S.Ct. 2954, 2967, 57 L.Ed. (2d) 973, 992 (1978), because it "[did] not preclude consideration of relevant mitigating factors." The trial judge stressed the jury was not limited to the statutory mitigating circumstances but could consider any mitigating circumstances that it chose to consider and, for that matter, could recommend a life sentence even in the absence of a mitigating circumstance. His charge on mitigating circumstances, printed below,[1] mirrors somewhat the charge consid-

---

[1] The judge charged the jury:

> I will now instruct you on what you may consider in making your decision as to which sentence to recommend, and there are two conditions which yhou should consider in reaching your decision. First, whether the defendant has proven by any evidence the existence of any mitigating circumstance. Second, whether for any reason you can think of, or for no reason at all the defendant should be sentenced to life imprisonment.

ered and not invalidated by the United States Supreme Court in *Boyde*, 494 U.S. at 373, 110 S.Ct. at 1194, 108 L.Ed. (2d) at 324-25, n. 1.

Had the trial judge specifically charged the non-statutory mitigating circumstances requested by Charping, the jury might well have concluded any other mitigating circumstance supported by the evidence had lesser footing and, therefore, was not worth considering. The way in which the trial judge charged the jury about mitigating circumstances conveyed to the jury the impression that it had the widest possible discretion for determining whether to recommend a life sentence.

What is a mitigating circumstance? It is a circumstance recognized as one which in fairness and mercy may be considered to be extenuating. A mitigating circumstance is neither justification nor excuse for the murder. It simply lessens the severity of the punishment because of its existence. Now what are some of the statutory mitigating circumstances you can consider in this case, and I refer once again to the form that will be given to you entitled statutory instructions, and immediately below the listing of the statutory aggravating circumstances, which I quoted to you earlier, the text continues, and it says, "You shall also consider the following statutory mitigating circumstances. One, the defendant has no significant history of prior criminal conviction involving the use of violence against another person. Two, the murder was committed while the defendant was under the influence of mental or emotional disturbance. Three, the victim was a participant in the defendant's conduct, or consented to the act. Four, the defendant was an accomplice in the murder committed by another person, and his participation was relatively minor. Five, the capacity of the defendant to appreciate the criminality of his conduct, or to conform his conduct to the requirements of the law was substantially impaired. Six, the age or mentality of the defendant at the time of the crime," and it's also written, ladies and gentlemen, "In addition you shall consider any and all other nonstatutory mitigating circumstances not listed above."

Now, the mitigating circumstances which I have read for your consideration, and which you will have in the jury room are given to you merely as examples of some of the factors that you may take into account as reasons for deciding not to impose a death sentence upon a defendant, or the defendant. You should pay careful attention to each of these factors. Any one of them may be sufficient standing alone to support a decision that death is not the appropriate punishment in the case, but you should not limit your consideration of mitigating circumstances to those specific factors that I just read to you, and that are listed on that form.

You may also consider any other circumstance relating to the case, or to the defendant James Michael Charping as reasons for not imposing the death sentence. In other words, you may in your good judgment impose a life sentence for any reason at all that you see fit to consider, or for no reason, and you need not find a mitigating circumstance at all to impose a life sentence. You need not find a mitigating circumstance be-

Regardless, there is no reasonable likelihood, considering the trial judge's charge on mitigating circumstances as a whole, that the jurors understood his instructions on mitigating circumstances to preclude their consideration of relevant mitigating evidence not specifically presented to them orally or in writing. *Cf. Boyde,* 494 U.S. at 381, 110 S.Ct. at 1198, 108 L.Ed. (2d) at 329 (wherein the United States Supreme Court found there was not a reasonable likelihood that the jurors understood a challenged instruction to prevent consideration of mitigating evidence).

## VIII.
Charping argues the trial judge violated the Eighth

---

yond a reasonable doubt. In reaching your decision as to which sentence to recommend you will consider the aggravating, and mitigating circumstances. While an aggravating circumstance must be found beyond a reasonable doubt before you can ever consider recommending the death penalty, once such finding is made beyond a reasonable doubt you may still recommend the death sentence even if you also find the existence of a mitigating circumstance, or mitigating circumstances. In other words, ladies and gentlemen, the existence of a mitigating circumstance does not keep you from imposing the death penalty. However, even if you should conclude that any or all of the statutory aggravating circumstances exist, you may consider whether the defendent should be sentenced to life imprisonment for any reason, or for no reason at all. Should such be your decision you will simply return to the court one of the two life imprisonment forms which I explain to you. ·

The judge later gave the following supplemental instruction to clear up any possible confusion as to the jurors' consideration of mitigating circumstances:

Ladies and gentlemen, I want to make one correction on something that was instructed to you by the court. During the charge when I was explaining to you life imprisonment forms, and then I told you that I was going to instruct you on what you may consider in making your decision as to which sentence to recommend, and I told you that there are two conditions which you should consider in reaching your decision. I said to you first, whether the defendant has proven by any evidence the existence of any mitigating circumstance. And, second, whether for any reason you can think of, or for no reason at all the defendant should be sentenced to life imprisonment. The correction that I want to make deals with the first condition when I said, whether the defendant has proven by any evidence the existence of any mitigating circumstance. I want to correct that to say, the first condition is, whether there is any evidence supporting the existence of a mitigating circumstance, statutory or nonstatutory mitigating circumstance. In other words, ladies and gentlemen, do not pay attention to what I first told you when I said, whether the defendant has proven by any evidence. What you are instructed to follow is, whether there is any evidence supporting the existence of a mitigating circumstance, statutory or nonstatutory mitigating circumstance.

Amendment by refusing to charge the jury that it was not necessary for the jury to agree unanimously on the existence of any particular mitigating circumstance in order to recommend a life sentence.

This contention lacks merit because the trial judge's charge[5] did not suggest that the jury had to agree unanimously on the existence of a mitigating circumstance for it to recommend a life sentence. *See State v. Atkins*, 308 S.C. 214, 399 S.E. (2d) 760 (1990), *cert. denied*, — U.S. —, 111 S.Ct. 2913, 115 L.Ed. (2d) 1076 (1991) (wherein the Supreme Court rejected a contention that an almost identical instruction might have misled a jury to believe it had to find, unanimously, the existence of a mitigating circumstance before considering evidence in mitigation). As in *Atkins*, the trial judge here emphasized "the jury could recommend a life sentence 'for any reason or no reason,' and that it need not find a mitigating circumstance in order to impose life imprisonment." *Id.* at 221, 399 S.E. (2d) at 764.

At any rate, there is no reasonable likelihood that the jurors applied the instructions as Charping seems to suggest. *Cf. Boyde*, 494 U.S at 381, 110 S.Ct. at 1198, 108 L.Ed. (2d) at 329.

## IX.

Charping argues the construction or application of the aggravating circumstance involving kidnapping, S.C. Code Ann. § 16-3-20(C)(a)(1)(b) (Supp. 1991), is unconstitutionally broad or vague because it does not limit a jury's discretion in considering whether to recommend the death penalty. His argument centers on the kidnapping statute as it appeared before its recent amendment, S.C. Code Ann. § 16-3-910 (1985).

I would adhere to this court's prior determinations upholding the statute against an attack on overbreadth grounds. *See State v. Davis*, — S.C. —, 422 S.E. (2d) 133 (1992); *State v. Copeland*, 278 S.C. 572, 300 S.E. (2d) 63 (1982), *cert. denied*, 460 U.S. 1103, 103 S.Ct. 1802, 76 L.Ed. (2d) 367 (1983).

---

[5] The trial judge charged the jury:

[Y]ou may in your good judgment impose a life sentence for any reason at all that you see fit to consider, or for no reason, and you need not find a mitigating circumstance at all to impose a life sentence. You need not find a mitigating circumstance beyond a reasonable doubt. . . . In your deliberations you would consider any mitigating circumstances.

## X.

Charping argues, for the first time on appeal, the trial judge erred by failing to charge the jury that the State was required to prove his specific intent to establish an aggravating circumstance. This charge was necessary, he contends, because otherwise the jury could recommend the death penalty based on aggravating circumstances for which he was only vicariously responsible.

To support his argument, Charping singles out the evidence that establishes Whitlock and not himself sexually violated the victim with a stick. Relying on *Enmund v. Florida*, 458 U.S. 782, 102 S.Ct. 3368, 73 L.Ed. (2d) 1140 (1982), Charping argues the death penalty is inappropriate unless the jury finds that he specifically intended, and is therefore personally culpable for, the aggravating acts that support the death sentence.

Charping misreads *Enmund* as requiring proof of "specific intent" before the penalty of death may be imposed. The Supreme Court has rejected the notion that "intent" is constitutionally required for a death sentence to stand, stating that a defendant's major participation in a felony when combined with a reckless indifference to human life is sufficient in itself to satisfy the *Enmund* culpability requirement. *Tison v. Arizona*, 481 U.S. 137, 158, 107 S.Ct. 1676, 1688, 95 L.Ed. (2d) 127, 145 (1987).

Charping apparently wishes the court to ignore the evidence detailing his own role in Joann Pruitt's murder. In referring to the sexual assault by Whitlock with the stick, Charping fails to mention that while Whitlock was doing this the evidence had him stop Joann attempting to strangle her.

This argument, therefore, lacks merit.

## XI.

Charping argues the court failed to instruct the jury during the penalty-determination phase that it could consider the opinion of expert witnesses and thereby deprived the jury of important mitigating evidence.

The trial judge, however, did remind the jury that certain expert testimony had been introduced and "that such testimony must be weighed and considered by you, just as any other testimony which has been presented."

In capital cases, I recognize, the jury may not be precluded from considering any relevant mitigating evidence. *Hitchcock v. Dugger*, 481 U.S. 393, 107 S.Ct. 1821, 95 L.Ed. (2d) 347 (1987). Here, the jury was not precluded from considering any evidence of mitigation in the form of opinion. As before, an expert witness's "testimony" necessarily took in any opinion given by the expert witness and, therefore, under the trial judge's charge, could be considered by the jury.

## XII.

Charping argues the trial judge erred in admitting certain color photographs during the penalty-determination phase. I disagree. The photographs depict the victim in substantially the same condition in which Charping left her and were probative of the aggravating circumstances of physical torture. *See State v. Kornahrens*, 290 S.C. 281, 350 S.E. (2d) 180 (1986), *cert. denied*, 480 U.S. 940, 107 S.Ct. 1592, 94 L.Ed. (2d) 781 (1987) (wherein the Supreme Court held the jury may be permitted to see photographs in the penalty-determination phase that depict the murder victim's body in substantially the same condition in which the defendant left it).

## XIII.

Charping's argument that the collective impact of numerous errors requires reversal of his convictions and sentences is without merit. While Charping has asserted numerous errors occurred during his trial, no error, neither purported nor real, merits a reversal of his convictions and sentences when considered either by itself or with any other. He received a fundamentally fair trial.

## XIV.

A sentence review required by § 16-3-25 of the Death Penalty Act discloses more than enough evidence to support the jury's finding of an aggravating circumstance in this case. Also, the death sentence here was not arbitrarily imposed and is not excessive. It is also not disproportionate to the penalty imposed in other similar cases, among them *State v. Davis*, — S.C. —, 422 S.E. (2d) 133 (1992) and *State v. Plath*, 281 S.C. 1, 313 S.E. (2d) 619, *cert. denied*, 467 U.S. 1265, 104 S.Ct. 3560, 82 L.Ed. (2d) 862 (1984).

Accordingly, I would affirm Charping's conviction and sentence for capital murder in addition to affirming his other convictions and sentences. At most, I would remand the issue of whether Charping effectively waived his statutory right to make a personal, closing argument during the guilt-determination phase of his trial.

TOAL, J., concurs.