551 S.E.2d 240

**The STATE, Respondent,**

v.

**Michael Paul SALTZ, Appellant.**

**No. 25337.**

Supreme Court of South Carolina.

Heard June 7, 2001.

Decided Aug. 6, 2001.

Rehearing Denied Sept. 12, 2001.

116

Jack B. Swerling, of Columbia, for appellant.

Attorney General Charles M. Condon, Chief Deputy Attorney General John W. McIntosh, Assistant Deputy Attorney General Donald J. Zelenka, and Solicitor Warren B. Giese, all of Columbia, for respondent.

BURNETT, Justice:

Michael Saltz (appellant) appeals his conviction for murder. We reverse.

## FACTS

Appellant was convicted of the murder of twelve-year-old Joseph Barefoot. Joseph disappeared on Sunday, May 25, 1997. As part of an extensive search for the missing boy, fliers were distributed throughout the community. The fliers described Joseph and indicated he was last seen in a white Chevy truck with a white male, aged fifteen to nineteen, named Mikey. It was inaccurate to state Joseph was "last seen" in the described truck. Two different witnesses described speaking to Joseph on Sunday afternoon, when he was out riding his bicycle. However, investigators later confirmed that seventeen-year-old Michael Saltz had given Joseph and his friend Charlie Mengedoht a ride in his white Chevy truck on Saturday, the day prior to Joseph's disappearance.

120

Because of his description on the missing person flier, appellant was the brunt of considerable teasing during the summer of 1997, while Joseph remained missing. Appellant reportedly "bragged" about killing Joseph to a number of his teenage friends, in what he describes in his brief to this Court as an "irrational[ ] and self-destructiv[e]" reaction "to being cast as prime suspect in a highly publicized case." There was testimony appellant said he "did it" "to get everybody off his back."

On September 16, 1997, Joseph's skeletal remains were discovered in a heavily wooded area behind the golf course near Starling Goodson Road. Within days of the discovery of Joseph's remains, three of appellant's friends—Sydney Johnston, Selina Welch, and Todd Ledford—all provided sworn statements to police implicating appellant. Appellant was brought in for questioning and eventually confessed to the murder. Appellant's seven consecutive statements are highly contradictory,[1] and the final statement, in which he incriminates only himself, is factually improbable. However, some details included in appellant's statements are consistent with evidence discovered at the crime scene. Most significantly, appellant stated he tied Joseph to a tree with a black nylon cord. A black nylon cord was found tied around a tree where Joseph's bones were found.

## ISSUES

I. Did the trial court erroneously rule on the admission of prior consistent statements?

 A. Statement of Sydney Johnston

 B. Statement of Tina Ashford

II. Did the trial court erroneously admit irrelevant evidence?

 A. Appellant's school attendance record

 B. Witness's feelings

III. Did the trial court err in limiting appellant's cross-examination of a witness for credibility and bias?

---

1. The contents of the statements and the circumstances surrounding their making are discussed *infra* in part IV.

IV. Did the trial court err in admitting appellant's statements as voluntary?

V. Did the trial court err in denying appellant's motion for a directed verdict?

## DISCUSSION

I. Prior consistent statements

Appellant argues the trial court twice erred in ruling on the admissibility of prior consistent statements of witnesses. In the first instance, appellant asserts the trial court erroneously permitted hearsay to bolster a prosecution witness's testimony. In the second instance, appellant asserts the trial court erroneously refused to admit testimony concerning a prior consistent statement of a defense witness. We agree the court erred in both instances.

■ The admission or exclusion of evidence is left to the sound discretion of the trial judge, whose decision will not be reversed on appeal absent an abuse of discretion. *State v. Tucker,* 319 S.C. 425, 462 S.E.2d 263 (1995).

Prior consistent statements of a witness are not inadmissible hearsay if

The declarant testifies at the trial or hearing and is subject to cross-examination concerning the statement, and the statement is . . . consistent with the declarant's testimony and is offered to rebut an express or implied charge against the declarant of recent fabrication or improper influence or motive; provided, however, the statement must have been made before the alleged fabrication, or before the alleged improper influence or motive arose.

Rule 801(d)(1)(B), SCRE. Thus, in order for a prior consistent statement to be admissible pursuant to this rule, the following elements must be present:

(1) the declarant must testify and be subject to cross-examination,

(2) the opposing party must have explicitly or implicitly accused the declarant of recently fabricating the statement or of acting under an improper influence or motive,

(3) the statement must be consistent with the declarant's testimony, and

(4) the statement must have been made prior to the alleged fabrication, or prior to the existence of the alleged improper influence or motive.

### A. Sydney Johnston/Jan Kopel

Appellant first argues the trial court erred in permitting Jan Kopel to testify concerning a prior consistent statement made by Sydney Johnston.

Sydney testified that appellant stated, "I killed Joseph Barefoot." On cross-examination, defense counsel questioned Sydney as follows:

Defense Counsel: Do you recall telling me that the first thing he said was, "I really didn't do it"? Do you recall?

Witness: No, I didn't say that.

Defense Counsel: You don't recall saying that?

Witness: No, I don't.

Defense Counsel: Do you recall telling me that when he finally said, "I did it," you used the word "sarcastically"? Do you recall that?

Witness: Yes. And my version of "sarcastically" is kind of bragging, kind of, I don't want to say vain because that's— but it's bragging.

Defense Counsel: Okay, but you don't recall saying that the first thing he said was, "I really didn't do"? [sic].

Witness: Right.

Defense Counsel: You don't recall that part?

Witness: No.

. . . .

Defense Counsel: Well, do you recall saying to me at that time with everyone else present, not using the words that he said, "I killed him," but he said, "Yeah, I did it," as opposed to, "I killed him"? Do you recall making that statement?

Witness: Yes, I do, to you. And the more that I've been able to go back and look over everything, it was a "Yeah, I killed him" thing.

Over appellant's objection, the trial court permitted Kopel to testify concerning the following conversation, which took place between Kopel and Sydney the day after Joseph's remains were found:

> She [Sydney] said that—they call him "JoJo" Barefoot or this child, "JoJo," had been found and that someone named Mikey had told her a while back—she didn't say exactly when—but he had killed this child that was missing. And she didn't know about anybody being missing or no bones had been found or body had been found or anything. And so she just kind of didn't know whether to believe him or not and was feeling guilty because she felt like maybe if she had come forward sooner that they may have found him.

Appellant argued to the trial court, and now argues on appeal, that Kopel's testimony was improperly permitted to bolster Sydney's testimony. Appellant argues that Rule 801(d)(1)(B), SCRE, is inapplicable in this instance because he very deliberately did *not* suggest that Sydney had recently fabricated her testimony or was acting under an improper influence or motive. On the contrary, appellant asserts, his cross-examination was very carefully restricted to whether or not Sydney's trial testimony was consistent with a statement she had made to defense counsel and his investigator shortly before trial. The trial court ruled that defense counsel's cross-examination placed Sydney's credibility before the jury, and thus Rule 801 permitted the State to offer a prior consistent statement. Thus, the precise issue here is whether questioning the witness concerning a prior *in* consistent statement invokes Rule 801(d)(1)(B). We conclude it does not.

■ Under the common law in South Carolina, proof of a prior consistent statement was admissible to rehabilitate a witness who had been impeached with a prior inconsistent statement. *See, e.g., Burns v. Clayton,* 237 S.C. 316, 336–37, 117 S.E.2d 300, 310 (1960) ("Where the credit of a witness has been impeached by proof or imputation that he has made declarations inconsistent with what he has sworn to, an exception to the hearsay rule permits proof of his declarations, consistent with what he has sworn to, made on other occasions prior to the existence of his relation to the cause."). The State relies on these pre-SCRE cases. Rule 801(d)(1)(B) changed

this rule. The plain language of Rule 801(d)(1)(B) only permits evidence of a prior consistent statement when the witness has been charged with recent fabrication or improper motive or influence. Although questioning a witness about a prior inconsistent statement does call the witness's credibility into question, that is not the same as charging the witness with "recent fabrication" or "improper influence or motive." *Cf. Tome v. United States*, 513 U.S. 150, 157, 115 S.Ct. 696, 130 L.Ed.2d 574 (1995) ("Prior consistent statements may not be admitted to counter all forms of impeachment or to bolster the witness merely because she has been discredited.... The rule speaks of a party rebutting an alleged motive, not bolstering the veracity of the story told."). Appellant questioned the accuracy of the witness's memory; he did *not* charge her with recent fabrication or improper influence or motive. The State should not have been permitted to introduce hearsay testimony of Sydney's prior consistent statement because appellant's cross-examination of Sydney did not imply recent fabrication or improper influence or motive. The trial court's admission of the testimony pursuant to former evidentiary rules constituted an error of law amounting to an abuse of discretion.

■ Moreover, the error was not harmless. Erroneously admitted corroboration testimony is not harmless merely because it is cumulative. On the contrary, "it is precisely this cumulative effect which enhances the devastating impact of improper corroboration." *Jolly v. State*, 314 S.C. 17, 21, 443 S.E.2d 566, 569 (1994). Here, Sydney's testimony was weak and not particularly credible,[2] and the improper corroboration could not have been harmless.

B. Tina Ashford/Buddy Hancock

Appellant next argues the trial court erred in refusing to allow Buddy Hancock to testify concerning a prior consistent statement made by Tina Ashford, a defense witness. This issue involves a different aspect of Rule 801(d)(1)(B), SCRE.

Charlie Mengedoht testified for the prosecution. On cross-examination, appellant was permitted to attempt to impeach

---

2. On direct examination, when asked what appellant said, Sydney first answered, "I don't remember," and then later said, "I do remember what he said. It was—he said, 'I killed Joseph Barefoot.'"

Charlie by asking him about a statement he had allegedly made to Tina Ashford implicating himself in Joseph's death:

Defense Counsel: Did you make a statement at that time that you and others put a bag over Joseph's head, beat him and kicked him. He cried and whimpered and tried to crawl away but could not, and that you left the body in the woods behind the golf course behind Starling Goodson Road and that you went back several times to view the body?

Witness: No, I don't recall saying that.

The statement did not qualify as admissible evidence of third party guilt; thus, the questions were permitted for impeachment purposes only, and the jury was so instructed. On redirect, Charlie testified that Tina was appellant's girlfriend, but had once been his (Charlie's) friend.

During the defense case, Tina testified that in the summer of 1997, Charlie told her he and unidentified accomplices killed Joseph as described above. This testimony was consistent with an affidavit Tina had signed on February 23, 1999. On cross-examination, Tina admitted appellant was her boyfriend of four months. However, she testified she did not know appellant in the summer of 1997. The solicitor asked Tina:

So thirteen days before the jury is going to be deciding Michael Saltz's, whether he's guilty or innocent of this crime, thirteen days prior to that jury being selected you go into your boyfriend that you love's lawyer's office and sign an affidavit indicating somebody else might have been involved in this incident that happened two years ago?

When asked why she did not contact the police right away, Tina testified that she told her father about Charlie's statement, and her father contacted the police.

The defense then called Buddy Hancock, Tina's father. After a discussion of Rule 801(d), the State additionally objected to Hancock testifying because he had been present in the courtroom during his daughter's testimony. The trial court permitted the defense to proffer Hancock's testimony prior to the court ruling on its admissibility. Hancock testified *in camera* that Tina came to him in the summer of 1997 and told him what Charlie allegedly told her concerning Joseph's death. However, when asked whether he contacted the police concerning the statement, Hancock testified:

Witness: I told [the police] the little boy, what I heard all around lower Richland there, the little boy was run away from home and he was out in˙the woods and he was going down to Food Lion, was out in the woods behind Food Lion, going in the Food Lion getting food, sneaking food out of there, going back in the woods.

Defense Counsel: Did you tell them anything about Charlie Mengedoht?

Witness: I told them Charles was—Charles was—at the time, what I hear around there, Charles was taking him food because he was hiding him out.

The trial court refused to permit Hancock to testify before the jury, but did not state a reason.

This line of questioning is precisely what Rule 801(d)(1)(B) was designed to address. The Solicitor's questions charged the witness with both recent fabrication (coming forward thirteen days before trial) and improper motive (her romantic relationship with defendant). Thus, Rule 801(d)(1)(B) permits appellant to offer evidence of a prior consistent statement made before the alleged fabrication or improper motive arose. The issue here is thus whether the trial court could, in its discretion, nevertheless exclude corroborating testimony for other reasons. Although the judge did not give a reason for his ruling, the State offers two reasons why it was within the court's discretion to disallow the testimony. We may affirm for any reason appearing in the record. Rule 220(c), SCACR.

First, the State asserts Hancock's testimony was tainted by his *"apparent* violation" of the sequestration order (emphasis added). The decision whether to waive a sequestration order for witnesses present during the trial rests in the sound discretion of the trial judge. *State v. Cabbagestalk,* 281 S.C. 35, 314 S.E.2d 10 (1984). Although it may have been within the trial court's discretion to disallow Hancock's testimony if Hancock had violated the sequestration order, the record is insufficient to support such a finding. Second, the State asserts Hancock's testimony could "possibly lead to unfair prejudice, confusing of the issues [sic]" under Rule 403, SCRE. We do not see any basis for excluding Hancock's testimony under Rule 403. Appellant should have been allowed to answer the State's charge of recent fabrication and

improper motive. Since we have already ruled appellant is entitled to a new trial, we need not conduct a harmless error analysis.

II. Irrelevant evidence

Appellant argues the trial court erred in admitting irrelevant evidence on two occasions, each of which will be discussed in turn.

■ Only relevant evidence is admissible. Rule 402, SCRE. " 'Relevant evidence' means evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." Rule 401, SCRE. Even if evidence is relevant, it "may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence." Rule 403, SCRE. Unfair prejudice means an undue tendency to suggest decision on an improper basis, such as an emotional one. State v. Kelly, 343 S.C. 350, 540 S.E.2d 851(2001). The trial court is given broad discretion in ruling on questions concerning the relevancy of evidence, and its decision will be reversed only if there is a clear abuse of discretion. Id.

A. Appellant's attendance record

Appellant argues the trial court abused its discretion in admitting his school attendance record. We agree.

■ Over appellant's objection, the court allowed the records custodian of Richland County School District One to testify that appellant was absent from school without an excuse on Thursday, May 29, 1997. The fact appellant was absent from school on Thursday, May 29, 1997 did not tend to make "the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." See Rule 401, SCRE. Joseph was last seen on Sunday, May 25, 1997. His body was found on September 16, 1997. The State asserts the evidence was relevant, although admittedly of "little probative value," because it "reveal[ed] that [appellant's] whereabouts on that

128

date were [as] unknown as [Joseph's]." However, the State presented no evidence Thursday, May 29, 1997 had any consequence to this case. On the contrary, introduction of this irrelevant evidence encouraged the jury to speculate that Thursday, May 29, 1997 must be significant to the case in some way unknown to them. Moreover, admission of this irrelevant evidence served to portray appellant as a delinquent. Even if the evidence were marginally relevant, it unfairly prejudiced appellant, confused the issues, and misled the jury, and therefore should have been excluded.

B. Testimony of Shasta Mengedoht

■ Appellant argues the trial court abused its discretion in admitting irrelevant testimony of Shasta Mengedoht concerning her feelings. We agree.

Mengedoht was close friends with Jackie Barefoot, Joseph's mother, and she was also the mother of Charlie Mengedoht, Joseph's friend. She testified for the prosecution. Defense witnesses had testified that Joseph was seen playing in the Mengedohts' yard after the time of his disappearance. In reply, the State called Mengedoht. The following colloquy took place:

Solicitor: Are you aware that there has been inferences made that Joseph Barefoot was at your house in June and July of 1997?

Witness: I was only made aware of that last night.

Solicitor: How does that make you feel?

Defense Counsel: Objection, Your Honor.

The Court: Overruled.

Witness: Well, it's really sad. You know, Jackie and I, we've watched a lot of sunsets together. And every time –

Defense Counsel: Your Honor, I think this is not relevant.

The Court: Wait a minute. Sir?

Defense Counsel: This is not relevant, Your Honor.

Solicitor: He's making the inference, Your Honor.

The Court: Yes, sir. I'm going to allow her to testify.

Defense Counsel: I mean, I understand that—the bottom line is that how that makes her feel is not relevant to any

issue in this case. It doesn't affect credibility. It doesn't affect any issue in this case.

The Court: Your objection is overruled. You may answer the question.

Witness: As I was saying, we had watched a lot of sunsets together, and each time I would say, "God, I hope Joe can see this too," and find some kind of comfort and know that we would not give up and that we loved him. It's just sad that we have to sit here now. And I was –

Defense Counsel: Objection, Your Honor.

The Court: All right, thank you ma'am. That's enough.

The trial court abused its discretion in allowing this testimony over appellant's repeated objections. The witness's thoughts and feelings did not make the existence of any fact of consequence to the case more or less probable. On the contrary, the testimony only served "to arouse the sympathy or prejudice of the jury." *Cf. State v. Langley*, 334 S.C. 643, 647, 515 S.E.2d 98, 100 (1999) (a photograph should be excluded if it is calculated to arouse the sympathy or prejudice of the jury or is irrelevant or unnecessary to substantiate facts).

Additionally, we address the State's contention that this error is unpreserved because appellant did not move to strike the testimony. The requirement that a party move to strike objectionable testimony applies when an objection has been *sustained. See State v. Wingo*, 304 S.C. 173, 177–78, 403 S.E.2d 322, 325 (Ct.App.1991) (a motion to strike is necessary where a question is answered before an objection thereto has been interposed, even though the objection is sustained) (*citing* 88 C.J.S. Trial § 133, at 268 (1955)). Here, the trial court never sustained any of appellant's objections. Therefore, no additional action was required of appellant to preserve this issue for appellate review.

III. Cross-examination

Appellant argues the trial court erred in limiting his cross-examination of Shasta Mengedoht for credibility and bias and that such limitation violated his constitutional right to confront the witnesses against him. We disagree.

As discussed above, Mengedoht was Charlie's mother and Jackie Barefoot's friend. Appellant sought to cross-examine Mengedoht concerning her respective loyalties to her son and her friend, as follows:

Q: I understand Jackie Barefoot is your friend. Correct?

A. Yes, she is.

Q. And I understand you're extremely loyal to her?

A. Yes, I am.

Q. And Charlie is your son?

A. Yes.

Q. And, ma'am, if you had to make a choice and there was no middle ground --

Solicitor: Objection to this. I know where he's going. I object. We need to approach the bench.

The jury was excused and the following bench conference took place:

The Court: All right, sir. What is the question you want to ask?

Defense Counsel: Very simple, Your Honor. I want to be allowed to ask the witness that if she had to make a choice between being loyal to her friend and protecting her son, what would it be? That's all. It's a credibility question. It doesn't go to third party guilt. I[sic] not arguing third party guilt, Judge.

The Court: No, sir. She hasn't testified about her son at all. She was called back in reply testimony to rebut your testimony that the victim was playing football in her yard three weeks after he was missing. And I'm not going to let you go back now and start bringing in something else about her son being accused of this crime. That's totally irrelevant.

Defense Counsel: He's not being accused, Your Honor. What was irrelevant was her testimony about how it made her feel to listen to the other testimony. I was not asking her about her son being accused. I've never accused him, Your Honor. The witnesses place him –

The Court: Your objection is overruled [sic]. Sit down.

■ The right to a meaningful cross-examination of an adverse witness is included in the defendant's Sixth Amend-

ment right to confront his accusers. *State v. Aleksey,* 343 S.C. 20, 33, 538 S.E.2d 248, 255 (2000). This does not mean, however, that trial courts conducting criminal trials lose their usual discretion to limit the scope of cross-examination. *Id.; see also State v. Lynn,* 277 S.C. 222, 284 S.E.2d 786 (1981) (a trial court's ruling concerning the scope of cross-examination of a witness to test his credibility should not be disturbed on appeal absent a manifest abuse of discretion). On the contrary, "trial judges retain wide latitude insofar as the Confrontation Clause is concerned to impose reasonable limits on such cross-examination based on concerns about, among other things, harassment, prejudice, confusion of the issues, witness' safety, or interrogation that is repetitive or only marginally relevant." *Delaware v. Van Arsdall,* 475 U.S. 673, 679, 106 S.Ct. 1431, 89 L.Ed.2d 674 (1986).

In *Van Arsdall,* the United States Supreme Court held "a criminal defendant states a violation of the Confrontation Clause by showing that he was prohibited from engaging in *otherwise appropriate* cross-examination designed to show a prototypical form of bias on the part of the witness, and thereby 'to expose the jury to the facts from which jurors ... could appropriately draw inferences relating to reliability of the witness.'" *Id.* at 680, 106 S.Ct. 1431 (emphasis added) (quoting *Davis v. Alaska,* 415 U.S. 308, 318, 94 S.Ct. 1105, 39 L.Ed.2d 347 (1974)). However, this Court has cautioned the bench that "before a criminal defendant can be prohibited from engaging in [such cross-examination] ..., the record must clearly show that the cross-examination is somehow inappropriate." *State v. Graham,* 314 S.C. 383, 385–86, 444 S.E.2d 525, 527 (1994).

The first question, therefore, is whether the proposed cross-examination was inappropriate. A witness may be impeached with evidence of "[b]ias, prejudice or any motive to misrepresent." Rule 608(c), SCRE. We recently held this rule "preserves South Carolina precedent holding that generally, 'anything having a legitimate tendency to throw light on the accuracy, truthfulness, and sincerity of a witness may be shown and considered in determining the credit to be accorded his testimony.'" *State v. Jones,* 343 S.C. 562, 541 S.E.2d 813 (2001) (quoting *State v. Brewington,* 267 S.C. 97, 101, 226 S.E.2d 249, 250 (1976)). "On cross-examination, any *fact* may

be elicited which tends to show interest, bias, or partiality of the witness." *State v. Starnes,* 340 S.C. 312, 325, 531 S.E.2d 907, 914–15 (2000) (emphasis added) (also quoting *Brewington,* 267 S.C. at 101, 226 S.E.2d at 250). Although evidence of Mengedoht's relationship to Charlie would unquestionably be admissible to show Mengedoht's possible bias, the jury was already fully aware Mengedoht was Charlie's mother. Appellant sought to ask Mengedoht what she would do "if she had to make a choice between being loyal to her friend *and protecting her son.*" This question did not seek to elicit a **fact** tending to show bias. *Starnes,* 340 S.C. at 325, 531 S.E.2d at 914–15; *cf. State v. Fossick,* 333 S.C. 66, 508 S.E.2d 32 (1998) (*evidence* which is inadmissible to prove third-party guilt may still be admissible for impeachment purposes) (emphasis added). We believe the question was inappropriate and the trial court properly exercised its discretion in disallowing it.

## IV. Voluntariness of statements

Appellant argues the trial court abused its discretion by admitting statements he gave to the police. We disagree.

Several officers were involved in bringing appellant to the station and questioning appellant while there. The three officers primarily involved were Investigator Jones, Sergeant Williamson, and Major Wilson. Jones had spoken with appellant on three occasions while investigating Joseph's disappearance. After Joseph's remains were found on September 16, 1997, police began investigating the crime as a homicide. Investigators became aware of some statements appellant had allegedly made to others concerning his role in Joseph's death. On September 18, officers made a "traffic stop" of appellant to see if he would voluntarily come to the police station for questioning. Jones testified that probably two police cars were involved in the stop. Appellant's two passengers testified the truck was surrounded by up to five police cars. Jones asked appellant if he would come to the station. Appellant answered, "No problem," and rode to police headquarters in an unmarked patrol car.

At the station, appellant was advised of his rights and signed a waiver. Appellant eventually admitted to police he

had bragged to his friends about killing Joseph, but denied any actual involvement in or knowledge of Joseph's death. The officers were convinced appellant was being untruthful. At this point, Williamson thought perhaps others were involved and appellant was holding back out of fear. Williamson testified he pled with appellant to tell the truth. He told appellant the only way they could help him was for him to tell the truth.

Ultimately, appellant made a series of incriminating statements. In the first statement, appellant told the officers he had bragged about killing Joseph but he did not really do it. Next he told them he had overheard some boys at school, whom he could not identify, talking about killing Joseph. Third, appellant told police he had overheard some people at school say they had killed Joseph. They told appellant where Joseph's body was located. Appellant stated he went to see the body and it was decomposing and the bones were sticking out. Again, appellant was unable or unwilling to identify the speakers.

Between appellant's third and fourth statements, appellant asked Wilson about the different degrees of murder and the penalties for each. Wilson explained that South Carolina does not have degrees of murder, and then explained to appellant the differences among murder, manslaughter, and involuntary manslaughter.

Appellant then changed his story dramatically. In his fourth version, appellant told officers Todd Ledford and Joseph had argued. Joseph rode off on his bicycle and Todd and two other boys chased him, caught him, hog-tied him, and carried him into the woods. After a few minutes, Todd and the other two boys returned to the truck without Joseph and they drove off. Next, appellant told the officers everything in the previous story was true except for the fact that he went into the woods with Todd and the other boys along with Joseph. He stated that Joseph was hog-tied with his feet and hands tied behind him. When they got into the woods, the other boys started hitting and kicking Joseph. Appellant denied hitting Joseph. He said Joseph was crying and whimpering and he felt bad because he could have stopped them,

and could have taken Joseph home, but instead he left him there. Appellant also described Joseph's bicycle.

At this point, appellant took a bathroom break. In the bathroom, he asked Williamson, "What if someone else is involved?" Williamson reported appellant's question to Wilson. Wilson told appellant sometimes when people confess to a crime, they implicate others in order to get back at someone they think told on them. Wilson told appellant he should tell the truth about whether Todd was there, because it would make appellant look worse if he lied about Todd's involvement. Appellant then stated that Todd was not there; he was just mad at Todd for telling on him. Appellant again asked, "What if someone else is involved?" but did not name any other participants.

In his sixth story, appellant said events happened as he had described in versions four and five, except Todd was not there, just appellant and two other boys whom appellant refused to name. Wilson then asked what had happened to Joseph's pants.[3] Appellant reacted physically to the question, became defensive, and then recanted his previous stories and denied all knowledge of Joseph's death.

Concerned that he had put appellant on the defensive by asking about Joseph's pants, Wilson asked Williamson to take over questioning appellant. Williamson took appellant to the canteen for a snack and then asked for a written statement. Appellant then gave his final statement to police, which Williamson recorded and appellant signed and swore to. In this statement, appellant incriminated himself only. He stated he saw Joseph two or three weeks after Joseph was reported missing. Joseph was bad-mouthing appellant so appellant knocked him out. Appellant then carried Joseph to a tree, tied Joseph to it with black nylon cord, and left him there.

The first six statements were recorded in the officers' notes, but not tape recorded or signed by appellant. Wilson corroborated Williamson's testimony regarding the substance of the statements. The officers testified at no time did appellant express a desire to cut off questioning or seek the advice of counsel.

---

**3.** Joseph's shoes, socks, and shirt were found at the scene, but no pants or underwear were found.

After he had given his written statement, appellant was permitted to meet with his parents and call his girlfriend that evening. The next morning, after spending the night in jail, Williamson advised appellant of his rights again and began to speak with him further to determine whether others were involved in the crime. Appellant stated everything in his written statement, in which he incriminated only himself, was true. Appellant then asked if his lawyer had arrived. This was the first time appellant mentioned a lawyer. Williamson immediately terminated the interview.

In response to cross-examination, Jones denied that appellant asked him for permission to call his father. Williamson stated appellant asked for his parents during the time they were together, but he did not permit appellant to call them. However, Williamson did try to contact appellant's father around 5:30 that afternoon to let him know where appellant was. Williamson denied telling appellant his mother was under investigation, denied threatening appellant with a "first-degree murder" charge if he did not give a statement, denied promising appellant probation or boys camp in exchange for a statement, and denied promising appellant he could go home if he gave a statement. Wilson, who was present from about 6:00 p.m. on, similarly denied telling appellant his mother was under investigation.

The entire interrogation, including breaks, lasted between six and seven hours.[4] Appellant was given *Miranda* warnings three times during the interrogation: upon arrival at the police station, before a polygraph was administered, and again prior to signing his written statement. He was advised of his rights a fourth time the following morning and given an opportunity to change his statement again. Appellant asserts his statements should have been excluded from evidence as the involuntary result of his will being overborne by his interrogators.

■■■■■■ A statement obtained as a result of custodial interrogation is inadmissible unless the suspect was advised of and voluntarily waived his rights under *Miranda v. Arizona*, 384

---

4. Appellant signed the first *Miranda* form just after 3:00 p.m. and gave his final statement around 9:30 p.m.

U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966). *Dickerson v. United States,* 530 U.S. 428, 120 S.Ct. 2326, 147 L.Ed.2d 405 (2000). If a defendant was advised of his *Miranda* rights, but nevertheless chose to make a statement, the "burden is on the State to prove by a *preponderance of the evidence* that his rights were voluntarily waived." *State v. Washington,* 296 S.C. 54, 370 S.E.2d 611 (1988) (emphasis in original). The trial judge's determination of the voluntariness of a statement must be made on the basis of the totality of the circumstances, including the background, experience, and conduct of the accused. *Schneckloth v. Bustamonte,* 412 U.S. 218, 93 S.Ct. 2041, 36 L.Ed.2d 854 (1973); *State v. Linnen,* 278 S.C. 175, 293 S.E.2d 851 (1982). If a suspect's will is overborne and his capacity for self-determination critically impaired, use of the resulting confession offends due process. *Schneckloth,* 412 U.S. at 225, 93 S.Ct. 2041. A statement induced by a promise of leniency is involuntary only if so connected with the inducement as to be a consequence of the promise. *State v. Peake,* 291 S.C. 138, 139, 352 S.E.2d 487, 488 (1987). The trial court's factual conclusions as to the voluntariness of a statement will not be disturbed on appeal unless so manifestly erroneous as to show an abuse of discretion. *State v. Kennedy,* 333 S.C. 426, 429, 510 S.E.2d 714, 715 (1998). When reviewing a trial court's ruling concerning voluntariness, this Court does not reevaluate the facts based on its own view of the preponderance of the evidence, but simply determines whether the trial court's ruling is supported by any evidence. *See State v. Wilson,* 345 S.C. 1, 545 S.E.2d 827 (2001).

 The trial court here found appellant's statements were freely and voluntarily given, that appellant was accorded all the procedural safeguards required by *Miranda,* and that appellant knowingly and intelligently waived his rights. We conclude the trial court correctly ruled the statements admissible. There is no evidence in the record whatsoever of any improper conduct on the part of the investigating officers nor of any deficiency on appellant's part which would call his waiver of rights into question. Although some of appellant's attorney's questions of the officers on cross-examination suggested improper coercion (*e.g.,* did they tell appellant his

mother was under investigation, did they promise probation or boys camp in exchange for a statement), the officers denied making any such statements. Appellant did not testify at the *Jackson v. Denno* [5] hearing and his attorney's questions do not constitute evidence. There is therefore no evidence in the record to contradict the officers' version of events, nor can we infer any such evidence.

In the absence of any evidence of police misconduct or diminished capacity, appellant would have this Court hold prolonged questioning of a seventeen-year-old makes any statements obtained involuntary. Although appellant's youth and the length of questioning are certainly important factors for the trial court to consider in determining whether appellant's statement was voluntary (*see Schneckloth*, 412 U.S. at 225, 93 S.Ct. 2041), the trial court correctly ruled the statements voluntary under the totality of the circumstances.

V. Directed Verdict

 Appellant argues the trial court erred in denying his motion for a directed verdict because there is no evidence Joseph was murdered. We disagree.

 Before a defendant in a criminal case can be required to present a defense, the State must present some proof of the *corpus delicti* of the crime. *State v. Brown*, 103 S.C. 437, 88 S.E. 21 (1916). In a murder case, the *corpus delicti* consists of two elements: the death of a human being, and the criminal act of another in causing that death. *State v. Martin*, 47 S.C. 67, 25 S.E. 113 (1896). An extrajudicial confession standing alone cannot constitute proof that a murder has taken place. The State must produce proof of the *corpus delicti* from a source other than the out-of-court confession of a defendant. *State v. Owens*, 293 S.C. 161, 359 S.E.2d 275 (1987). The *corpus delicti* of murder may be established by circumstantial evidence when it is the best evidence obtainable. *Id.* Furthermore, circumstantial evidence may be sufficient to establish the *corpus delicti* of

5. 378 U.S. 368, 84 S.Ct. 1774, 12 L.Ed.2d 908 (1964).

murder even though the cause of death can not be determined. *Brown v. State,* 307 S.C. 465, 467–68, 415 S.E.2d 811, 812 (1992). In *Owens,* the body of the victim was never found. Nevertheless, we held circumstantial evidence of the victim's personal habits and relationships raised an inference that the victim's sudden disappearance was the result of death by a criminal act and was thus sufficient to establish the *corpus delicti.*

The trial court ruled there was sufficient circumstantial evidence to establish the *corpus delicti,* including Joseph's good health, the rule in his house that he must be home by dark or call immediately, testimony the wooded area where Joseph's body was found was too thick to ride a bicycle, testimony from Joseph's best friend that they never played in that area, and testimony from an officer that it is very unusual for a twelve-year-old boy to be missing for any length of time. Appellant argues these facts are equally consistent with death by accident or sudden illness. However, when ruling on a motion for a directed verdict, the trial court is concerned with the existence or non-existence of evidence, not its weight. *State v. Robinson,* 310 S.C. 535, 538, 426 S.E.2d 317, 319 (1992). Furthermore, in reviewing the denial of a directed verdict motion, an appellate court must review the evidence in the light most favorable to the State. *State v. Rowell,* 326 S.C. 313, 487 S.E.2d 185 (1997). Considering the evidence in the light most favorable to the State, we conclude the trial court properly denied appellant's motion for a directed verdict. There is more than adequate circumstantial evidence to prove Joseph did not die a natural death.

## CONCLUSION

For the foregoing reasons, we **REVERSE.**

TOAL, C.J., MOORE, WALLER and PLEICONES, JJ., concur.