**THIS OPINION HAS NO PRECEDENTIAL VALUE. IT SHOULD NOT BE CITED OR RELIED ON AS PRECEDENT IN ANY PROCEEDING EXCEPT AS PROVIDED BY RULE 268(d)(2), SCACR.**

**THE STATE OF SOUTH CAROLINA**
**In The Court of Appeals**

The State, Respondent,

v.

Curtis Tyrone Williams, Appellant.

Appellate Case No. 2016-001994

---

Appeal From Charleston County
Deadra L. Jefferson, Circuit Court Judge

---

Unpublished Opinion No. 2019-UP-250
Submitted March 5, 2019 – Filed July 3, 2019

---

**AFFIRMED**

---

Appellate Defender David Alexander, of Columbia, for Appellant.

Attorney General Alan McCrory Wilson and Assistant Attorney General Vann Henry Gunter, Jr., both of Columbia; and Solicitor Scarlett Anne Wilson, of Charleston, all for Respondent.

---

**PER CURIAM:** Curtis Williams appeals his conviction of homicide by child abuse, for which he was sentenced to thirty years' imprisonment. Williams argues the circuit court erred by failing to exclude his statement that he hit the victim because

the statement was rendered involuntary by law enforcement's alleged promise to allow him to see his family.  We affirm.

## FACTS

Around 5:15 p.m. on October 26, 2014, Curtis Williams and two of his friends arrived at the Medical University of South Carolina (MUSC) frantically trying to push through the rotating door to the hospital and crying for help.  Williams was holding Child, his girlfriend's three-year-old son, who was limp and unresponsive. Upon entering MUSC, Williams handed Child to a nurse who began performing CPR.  Medical personnel called for a mayday team while continuing to administer CPR, noting that Child's skin, lips, and gums were blue.  When the mayday team arrived, Child was placed on a stretcher and rushed to the pediatric emergency room's trauma bay.  Sadly, doctors were unable to revive Child, and he passed away in the emergency room.

Before leaving the hospital, Williams gave his version of the day's events to medical staff, law enforcement, and Child's family.  Williams explained that he had been watching Child after Child's mother left for work at 9:00 a.m.  Williams indicated that he and Child were watching football on the TV when Williams decided to take Child to the park.  While at the park, Williams lost sight of Child for five to ten minutes.  Williams indicated that he found Child sitting on a bench with his head down.  Williams thought Child was acting strange, so the two walked home.  When they returned home, Williams tried to give Child some juice and a Tootsie Roll, but Child did not finish eating it, and Williams had to remove part of it from his mouth. A short time later, Williams's friends, Shaquille and D.S., arrived to watch football. Williams indicated that Child defecated in his pants around 3:30 p.m., so he removed his soiled clothing, bathed him, and changed him.  Williams explained that after giving him a bath, Child continued acting strangely and struggled to get comfortable while lying on the couch.[1]  Williams noticed Child began taking shallow breaths before ultimately going limp.  Williams then asked Shaquille to drive them to the hospital.

Dr. Erin Presnell performed Child's autopsy at 9:00 a.m. the following morning.  During the autopsy, Dr. Presnell determined that Child had five areas of bruising and nine areas of abrasion on his head, twenty-two bruises on his torso (including his buttocks), three bruises on the back of his right hand and arm, eleven

---

[1] During a reenactment of events for law enforcement, Williams further explained that Child was lying face down with his knees tucked under his stomach and rolling back and forth.

bruises on his left arm and forearm, and eleven bruises on his left leg. Dr. Presnell noted that Child's bruises displayed an early inflammatory response, suggesting that they had occurred within the nine hours prior to Child's death. Dr. Presnell also found that the bruising on Child's buttocks and back, including the area over his spleen, extended all the way to the deep tissue and muscle, indicating that the bruising was very deep. Child also had several non-fatal internal injuries, including some hemorrhaging on the outside of his colon, the bottom of his liver, and around the center part of his lung. Dr. Presnell also determined that Child's spleen had been lacerated,[2] resulting in half a liter of blood entering his abdomen. Dr. Presnell ultimately "classified the cause of death in this case as splenic laceration due to blunt trauma to the torso due to a beating." Accordingly, Child's death was ruled a homicide.

After learning of Child's cause of death, officers set up a meeting with Williams and Child's mother. Williams and Child's mother arrived for the meeting with Williams's mother, his sister, and his sister's two kids. Officers took Williams into an interview room and advised him of his Miranda rights. During the interview, officers repeatedly indicated that Williams's version of events did not make sense when considering the results of the autopsy. As the interview continued, Williams began asking to see his family, repeating his request several times. One of the officers asked Williams, "Why won't you just be able to leave with them?" One of the officers then said,

> How about this? If, for some crazy reason, you end up telling us what happened and it turns into a situation where you don't leave, we will guarantee that you see your family before they leave here. That's what you're worried about. You're worried that you won't get to see them because you don't think you're going to be able to leave.

Williams began crying and continued to ask for his family while officers consistently questioned him. Later in the interview, Williams told the officers that he had spanked Child. Eventually, Williams admitted that he had struck Child in the back for taking too long in the bathroom. Williams told officers that he found Child after he had finished using the bathroom, holding his private and "just standing there." At that point, Williams indicated that he punched Child one time in the back with a

---

[2] At trial, the State's expert in child abuse pediatrics testified that it takes a significant amount of force to cause such an injury to the spleen, as it is most commonly seen in motor vehicle collisions or sports injuries.

closed fist, and Child cried for about five seconds. After indicating to the officers that he had told them everything, Williams asked if they were really going to let him see his family. The officers responded affirmatively, indicating that they had given Williams their word. At the end of the interview, officers allowed Child's mother and Williams's mother to visit with Williams in the interview room.

Prior to trial, the circuit court held a *Jackson v. Denno*[3] hearing to determine the admissibility of Williams's statement to police. At first, the defense argued that the statement was involuntary because Williams was very emotional during the interview and "not in a good state of mind." After the State responded, the defense added, "In addition, Your Honor, just—he had asked multiple times to see his family. And the officer didn't just say, no, you can't see them. He had basically said, well, you can see them later, suggesting some sort of bargaining, Your Honor." The circuit court then asked, "Did he actually say that?" The defense responded, "He said he could see the family later. He never said, no, I'll make a deal with you." The circuit court then asked if Williams had been offered "some kind of bargain[.]" The defense responded, "No, Your Honor." Ultimately, the circuit court ruled the statement was voluntary and admissible, finding,

> There was no indication he was under any duress, other than the normal duress of the event, that he was made any promises, that he was under the influence of drugs or alcohol, or that he was threatened in any way or denied any substantial rights, such as a bathroom, et cetera, during the course of the interview. The defense has argued that he was not allowed to see his family. I would note for the record that the State has no constitutional obligation to allow him to see his family and they had more than protected interests in not letting him see his family, that being . . . not allowing someone to potentially collude with their family or see someone regarding an incident when they're in the middle of an interrogation. And so they had no obligation to allow him access to his family. Nor do I find any merit to the argument that somehow that was collusive or threatening or caused him to be under any particular duress. In fact, the statements made by police seemed to reassure [Williams] that once they [were] done, he would be allowed to see his family and that right

---

[3] 378 U.S. 368 (1964).

[would] not—that right or that desire, that request [would] not be denied to him.

At trial, Shaquille and D.S. testified that after arriving at Williams's home[4] on the day of Child's death, Williams indicated that he needed to meet Child's mother at Save-A-Lot,[5] and the group headed toward Shaquille's car. On the way to the car, Child defecated in his pants.[6] D.S. testified Williams carried Child back into the home, holding Child away from his body by Child's neck and waist. Child was left in the home by himself while Williams and his friends went to Save-A-Lot. When the group returned from Save-A-Lot, Williams cleaned Child, removed his soiled clothing with a knife, and bathed him. Both of Williams's friends testified Child had been slumped over and unusually quiet the majority of the time they were visiting with Williams and that Child had tried to sit up but could not.

To demonstrate Child's condition prior to his death, the State offered the director of Child's daycare to testify about three of the daycare's policies: 1) if a child at daycare soiled himself, that child would be cleaned, changed, and his clothes sent home in a bag; 2) if a child was injured at daycare, staff would write an incident report or call the parents on the spot; and 3) if daycare staff noticed bruising on a child, they would be required to report it to the South Carolina Department of Social Services. The director further testified that Child's last day at daycare was Friday, October 24, 2014,[7] and staff had not made a report concerning any injuries Child may have suffered at home or in daycare. The State also submitted evidence that Child had soiled himself at daycare that Friday, and staff cleaned him and changed his clothes. Similarly, Child's mother testified that on the day he died, Child did not have any bruises before she left for work.

Witnesses, including Williams's friend Shaquille, testified that Williams did not treat Child the same way he treated other children he looked after.[8] Child's mother and another witness further testified that Williams thought Child was too

---

[4] Williams, Child's mother, and Child all lived in the same apartment.

[5] Child's mother worked two jobs. She worked at Goodwill during the morning and Save-A-Lot during the afternoon.

[6] The State's expert in child abuse pediatrics testified that Child defecating in his pants was a sign of his body shutting down. As Child continued to bleed internally, the body began to cut off oxygen to the non-vital organs. After shutting down, Child's colon lost the ability to control itself.

[7] Child died on Sunday, October 26, 2014.

[8] Williams routinely babysat his nephews and his ex-girlfriend's daughter.

"soft" and would call him names like "mama's boy" or "punk a\*\*." Witnesses testified they had seen Williams "pop" Child before, and one of the neighbors testified that four or five days before Child's death, he woke up because he could hear a man through the shared wall hitting Child and telling him to go back to sleep. Child's mother and another witness indicated that Child was usually a talkative, cheerful three-year-old but Child was not himself around Williams. Child's mother also testified that around November 2014, Williams admitted to her that on the day Child died, he had hit Child in the back with a closed fist because Child had taken too long in the bathroom. Williams was ultimately convicted of homicide by child abuse and sentenced to thirty years' imprisonment. This appeal followed.

## ISSUE ON APPEAL

Did the circuit court err in finding Williams's statement voluntary and admissible despite an alleged improper promise by law enforcement?

## STANDARD OF REVIEW

"In criminal cases, the appellate court sits to review errors of law only." *State v. Wharton*, 381 S.C. 209, 213, 672 S.E.2d 786, 788 (2009). As such, "[appellate courts are] bound by the [circuit] court's factual finding unless they are clearly erroneous." *State v. Baccus*, 367 S.C. 41, 48, 625 S.E.2d 216, 220 (2006). "The admission of evidence is within the discretion of the [circuit] court and will not be reversed absent an abuse of discretion. An abuse of discretion occurs when the conclusions of the [circuit] court either lack evidentiary support or are controlled by an error of law." *State v. Goodwin*, 384 S.C. 588, 601, 683 S.E.2d 500, 507 (Ct. App. 2009) (quoting *State v. Pagan*, 369 S.C. 201, 208, 631 S.E.2d 262, 265 (2006)).

"When reviewing a [circuit] court's ruling concerning voluntariness, this [c]ourt does not reevaluate the facts based on its own view of the preponderance of the evidence[] but simply determines whether the [circuit] court's ruling is supported by any evidence." *State v. Saltz*, 346 S.C. 114, 136, 551 S.E.2d 240, 252 (2001). Accordingly, "the conclusion of the [circuit court] on issues of fact as to the voluntariness of a statement will not be disturbed unless so manifestly erroneous as to show an abuse of discretion." *State v. Kennedy*, 333 S.C. 426, 429, 510 S.E.2d 714, 715 (1998).

## LAW/ANALYSIS

Preservation

Williams argues the circuit court erred in admitting his statement because it was rendered involuntary by law enforcement's promise to allow him to see his family. The State argues this issue is not preserved for appellate review. We agree with the State.

At the outset, we agree with the State that this issue was not preserved for appeal because Williams conceded the issue at trial. During the *Denno* hearing, the defense argued that law enforcement's guarantee that Williams would be allowed to see his family suggested "some sort of bargaining." The circuit court asked the defense if law enforcement had actually offered Williams a deal. The defense replied, "He said he could see the family later. *He never said, no, I'll make a deal with you*." The circuit court then asked if Williams had been offered some type of bargain, and the defense responded, "No, Your Honor." Additionally, the defense did not make a similar objection or in any way attempt to re-raise the issue when the evidence was admitted. Accordingly, we find Williams conceded the issue of whether his statement was rendered involuntary by an improper promise. *See TNS Mills, Inc. v. S.C. Dep't of Revenue*, 331 S.C. 611, 617, 503 S.E.2d 471, 474 (1998) ("An issue conceded in [circuit] court may not be argued on appeal."); s*ee, e.g.*, *State v. Benton*, 338 S.C. 151, 156–57, 526 S.E.2d 228, 231 (2000) (finding appellant's request for a circumstantial evidence charge was "not preserved for appellate consideration as he previously conceded the palm print was direct evidence").

Therefore, Williams has not preserved this issue for appellate review. However, we will address the merits of the issue.

Merits

Williams argues the circuit court erred in admitting his statement because it was rendered involuntary by law enforcement's promise to allow him to see his family. We disagree.

The Fifth Amendment to the United States Constitution states, in pertinent part, "No person . . . shall be compelled in any criminal case to be a witness against himself . . . ." U.S. Const. amend. V. As such, the United States Supreme Court has held, "It is now axiomatic that the defendant's constitutional rights have been violated if his conviction is based, in whole or in part, on an involuntary confession, regardless of its truth or falsity." *Miranda v. Arizona*, 384 U.S. 436, 464 n.33 (1966). Conversely, "[a]ny statement given freely and voluntarily without any compelling influences is, of course, admissible in evidence." *Id*. at 478.

"To determine the voluntariness of a statement, the circuit court must first conduct an evidentiary hearing, outside the presence of the jury, [in which] the State must show the statement was voluntarily made by a preponderance of the evidence." *State v. Simmons*, 384 S.C. 145, 162, 682 S.E.2d 19, 28 (Ct. App. 2009). "The [circuit court]'s determination of the voluntariness of a statement must be made on the basis of the totality of the circumstances, including the background, experience, and conduct of the accused." *Saltz*, 346 S.C. at 136, 551 S.E.2d at 252.

> Some of the factors taken into account have included the youth of the accused; his lack of education; or his low intelligence; the lack of any advice to the accused of his constitutional rights; the length of detention; the repeated and prolonged nature of the questioning; and the use of physical punishment such as the deprivation of food or sleep.

*Schneckloth v. Bustamonte*, 412 U.S. 218, 226 (1973) (internal citations omitted). Furthermore, "[a] statement may not be 'extracted by any sort of threats or violence, [or] obtained by any direct or implied promises, however slight, [or] obtained by the exertion of improper influence.'" *State v. Miller*, 375 S.C. 370, 386, 652 S.E.2d 444, 452 (Ct. App. 2007) (alterations in original) (quoting *State v. Rochester*, 301 S.C. 196, 200, 391 S.E.2d 244, 246 (1990)). "A statement induced by a promise . . . is involuntary only if so connected with the inducement as to be a consequence of the promise." *Saltz*, 346 S.C. at 136, 551 S.E.2d at 252. In other words, "[i]f a suspect's will is overborne and his capacity for self-determination critically impaired, use of the resulting confession offends due process." *Id*.

Prior to admitting Williams's statement, the circuit court properly held a *Jackson v. Denno* hearing to determine its admissibility. In determining the statement was voluntary by a preponderance of the evidence, the court found that all of the requirements of *Miranda* were met, that Williams was of sufficient age and capacity to understand his rights, and that he waived his rights. The court further indicated that Williams was not under duress or the influence of drugs or alcohol, he was not threatened or denied any substantial rights, and no promises were made to him. Moreover, the court found that law enforcement's guarantee that Williams could see his family was a statement meant to reassure Williams that he would be allowed to see them following the interview, not a promise that he could see them in exchange for his statement.

"On appeal, the conclusion of the [circuit court] on issues of fact as to the voluntariness of a statement will not be disturbed unless so manifestly erroneous as

to show an abuse of discretion." *Kennedy*, 333 S.C. at 429, 510 S.E.2d at 715. Here, we find the circuit court's determination that law enforcement did not make Williams any promises in exchange for his statement is not manifestly erroneous. Williams was never explicitly told that he would be allowed to see his family in exchange for his confession nor was he told that he would not be allowed to see his family unless he confessed. Rather, officers told Williams that in the event he gave a statement that resulted in his arrest, he would be allowed to see his family before they left. Accordingly, we agree with the circuit court's finding that the officer's statement was meant to reassure Williams that he would be allowed to see his family after the interview and did not constitute a promise in exchange for his confession. As such, we find Williams's statement was given voluntarily, and the circuit court did not err in admitting it.

Harmless Error

Finally, even if the circuit court erred in admitting Williams's statement, the State argues such an error would have been harmless. We agree.

The erroneous admission of a defendant's involuntary statement is a trial error subject to harmless error analysis. *See Arizona v. Fulminante*, 499 U.S. 279, 310 (1991) ("It is evident from a comparison of the constitutional violations [that] we have held subject to harmless error[] and those [that] we have held not, that involuntary statements or confessions belong in the former category. The admission of an involuntary confession is a 'trial error,' similar in both degree and kind to the erroneous admission of other types of evidence."); *State v. White*, 410 S.C. 56, 59, 762 S.E.2d 726, 728 (Ct. App. 2014) ("[A]ny error in the failure to suppress a statement allegedly taken in violation of *Miranda* is subject to a harmless error analysis." (citing *State v. Easler*, 327 S.C. 121, 129, 489 S.E.2d 617, 621–22 (1997), *overruled on other grounds by State v. Greene*, 423 S.C. 263, 283, 814 S.E.2d 496, 507 (2018))).

As such, "[t]he key factor for determining whether a trial error constitutes reversible error is 'whether it appears beyond a reasonable doubt that the error complained of did not contribute to the verdict obtained.'" *State v. Tapp*, 398 S.C. 376, 389, 728 S.E.2d 468, 475 (2012) (internal quotations marks omitted) (quoting *State v. Charping*, 313 S.C. 147, 157, 437 S.E.2d 88, 94 (1993) (Goolsby, A.A.J., concurring in part and dissenting in part)). "Whether an error is harmless depends on the circumstances of the particular case." *Id*. (citing *State v. Mitchell*, 378 S.C. 305, 316, 662 S.E.2d 493, 499 (Ct. App. 2008)). "Thus, an insubstantial error not affecting the result of the trial is harmless whe[n] guilt has been conclusively proven by competent evidence such that no other rational conclusion can be reached." *State*

*v. Price*, 368 S.C. 494, 499, 629 S.E.2d 363, 366 (2006).  "Whe[n] a review of the entire record establishes the error is harmless beyond a reasonable doubt, the conviction should not be reversed." *Id.*

We find that any alleged error in admitting Williams's statement would be harmless beyond a reasonable doubt because the State presented other evidence conclusively proving Williams's guilt such that no other rational conclusion could be reached.  First, Child's mother testified that Williams admitted to striking Child one time in the back because Child was taking too long in the bathroom.  *See State v. Brown*, 344 S.C. 70, 75, 543 S.E.2d 552, 555 (2001) ("Evidence of this conduct, which was properly admitted, reveals the same information about appellant as Mrs. Brown's testimony.  Accordingly, we find any error in the admission of Mrs. Brown's testimony harmless beyond a reasonable doubt.").  Second, the State presented witness testimony indicating that Williams frequently insulted Child because he thought Child was "soft."  Third, the State presented evidence that Williams had struck Child in the past.  Fourth, the evidence presented at trial showed that Williams was not honest about the day's events when talking with medical personnel and law enforcement.  Williams did not indicate that he had left Child in the home after he defecated in his pants nor did Williams tell anyone, including the medical personnel trying to save Child's life, that he had struck Child in the back with a closed fist.  Fifth, evidence in the record, including Williams's own statements, indicated that Child's body was shutting down over the course of the day.

But perhaps the most compelling evidence of Williams's guilt was the circumstantial evidence presented by the State.  The State introduced evidence that Child had soiled himself at daycare on the Friday before he died to show that staff had changed his pants, and the director of Child's daycare testified that Child did not have any bruises before he went home that afternoon.  Similarly, Child's mother indicated that on the day Child died, Child did not have any injuries before she went to work.  However, Dr. Presnell testified Child had over fifty bruises, internal injuries, and a lacerated spleen at the time of his death.  Dr. Presnell further testified that Child's bruises had been inflicted within the nine hours prior to his death.  It is undisputed that Child was alone with Williams from the time Child's mother left for work around 9:00 a.m. until Williams's friends came over that afternoon.  As such, we are not convinced that Williams's statement affected the jury's verdict as his guilt was conclusively proven by other evidence such that no other rational conclusion could be reached.  Thus, we find any alleged error in admitting the statement was harmless beyond a reasonable doubt.

**CONCLUSION**

For the foregoing reasons, Williams's conviction is

**AFFIRMED.**[9]

**WILLIAMS, GEATHERS, and HILL, JJ., concur.**

---

[9] We decide this case without oral argument pursuant to Rule 215, SCACR.