**THIS OPINION HAS NO PRECEDENTIAL VALUE. IT SHOULD NOT BE
CITED OR RELIED ON AS PRECEDENT IN ANY PROCEEDING
EXCEPT AS PROVIDED BY RULE 268(d)(2), SCACR.**

**THE STATE OF SOUTH CAROLINA
In The Court of Appeals**

The State, Respondent,

v.

Tony Vernon Jordan, Appellant.

Appellate Case No. 2014-002554

———

Appeal From Abbeville County
Eugene C. Griffith, Jr., Circuit Court Judge

———

Opinion No. 2018-UP-098
Heard May 3, 2017 – Filed March 7, 2018

———

**AFFIRMED**

———

Appellate Defender Kathrine Haggard Hudgins, of
Columbia, for Appellant.

Attorney General Alan McCrory Wilson, Chief Deputy
Attorney General John W. McIntosh, and Deputy
Attorney General Donald J. Zelenka, all of Columbia;
and Solicitor David Matthew Stumbo, of Greenwood, all
for Respondent.

———

**HUFF, J.:** In 2014, an Abbeville County jury found Tony Vernon Jordan (Appellant) guilty of murder and possession of a weapon during the commission of a violent crime in the shooting death of his twenty-five-year-old son Jeremy Jordan (Victim). The trial judge sentenced Appellant to forty years' imprisonment for murder concurrent with five years' imprisonment on the weapons conviction. This appeal followed. Appellant contends the trial judge erred in admitting text messages under the business records exception to hearsay, Rule 803(6), SCRE. We affirm.

## FACTS / PROCEDUAL HISTORY

On November 11, 2013, Appellant and Victim were driving over the Little River Bridge in Abbeville County. They were going to a campground to ask Appellant's friend if Victim could borrow money to pay child support. Appellant and Victim were arguing, and Appellant stopped the car. According to Appellant's written confession, Victim was cussing at him and took a swing at him. Appellant stated, "I snapped and shot him." Appellant shot Victim in the back of the head. A passerby saw Victim's body on the bridge around 11:30 p.m. that night wedged under the railing and partially hanging off the side of the bridge. Appellant told investigators he tried to push Victim's body through the railing but it became stuck and Appellant left the scene. Appellant pulled Victim's sweatshirt over his head because Appellant "didn't want to look at him."

While Appellant was having breakfast the next morning at a restaurant, he approached local officers about Victim being missing. The coroner told Appellant the body found on the bridge was Victim and Appellant asked whether he was shot. After searching Appellant's house and car, investigators found blood on the car and on the shirt that Appellant said he wore the night before. Appellant told the investigators "give me until Friday and I'm all yours . . . [J]ust let me bury my son." The blood belonged to Victim.

Upon his arrest, Appellant confessed to the shooting. He told investigators where to find the gun, the blood stained clothing he wore during the shooting, and Victim's phone. Appellant admitted the bloody handprints found by investigators on the bridge rail were his. Appellant also told investigators that when he shot Victim, Victim "hit the ground and made a few grunting sounds. Then he knew he was dead."

At trial, the State called as a witness the records custodian of Verizon Wireless. The custodian testified about the procedure Verizon uses to compile records of text

messages and the content.  The custodian indicated these records are kept in the ordinary course of business.  The custodian explained Verizon keeps an electronic record in a computer database of every call or text message sent or received, the text content, cell tower information, and web pages accessed.  These records are generally kept three to ten days.

The State presented text messages (data and content) to and from Appellant's phone number for November 7, 2013, to November 12, 2013, as evidence under the business records exception (Exhibit 98).  During pretrial motions, the State argued the messages were relevant because they showed the shooting was premeditated murder by Appellant.  The State also argued the messages were kept in the ordinary course of business for Verizon and fell under the business records exception.  Appellant's counsel did not dispute that a log of text messages sent and received was a business record but claimed the text messages themselves were not admissible as a business record.  Appellant argued that the texts were not "the statement of a party opponent . . . they're not relevant . . . they're not admissions of anything."  The trial judge admitted exhibit 98 as a business record under Rule 803(6), SCRE.

The custodian read certain text messages for the jury.  One message was from Appellant to his girlfriend on November 8 (three days before shooting).  It referred to how Victim was possibly interfering in a court case against girlfriend's son and it stated in part:  "I'm mad as hell now.  His ass is mine."  One day before the shooting Appellant sent a text to Victim's mother (Appellant's ex-wife) questioning the paternity of Victim:

> I need to know something that has been on my mind for over 26 years.  August 1987 we were sitting in a doctor's office in North Myrtle Beach.  You found out you were pregnant with [Victim] and you asked me if this is [___'s] baby would I still love you.  Well, is he [___'s] or mine? I just need to know, even though it won't change a thing.[1]

The custodian also read a text from Appellant to his girlfriend on the day of the shooting that referred to Victim and stated in part "[t]hat problem is solved."

The custodian read a message sent by Appellant to Victim's fiancée the morning after the shooting which asked if she had talked to Victim "since last night?  He

---

[1] This text message was not otherwise testified to by a witness.

ain't been home since 10:30. I'm wondering what you say. Starting to worry a little bit." The custodian also testified that Appellant texted his daughter (Victim's sister): "Good morning. Call me when you get this. Your brother ain't at the house."

Appellant's girlfriend testified Appellant texted her frequently. The girlfriend stated Appellant would "text and text to the point that I felt suffocated. Just overwhelmed. And I tried to cut off communication." She testified she texted and asked Appellant to not "let [Victim] know anything" about her son's situation. Appellant texted back that he was "mad and that [Victim's] ass was his." Appellant texted the girlfriend on the morning of the shooting, November 11. She stated "he asked if the reason I wasn't talking to him, if it was because of what [Victim] … had said, that problem was solved."[2] After hearing the next morning that Victim was shot, she "got this real sick feeling in [her] stomach, and [she] looked back through [her] text messages that [she] had received the day before" and called the police about the text messages. The girlfriend also read a letter sent to her by Appellant after his arrest, wherein he professed his love for the girlfriend several times.

Victim's fiancée testified she received a text from Appellant at 5:45 a.m. on November 12. She stated the text asked "'Have you heard from [Victim]' and it says he hasn't seen him since 10:30 the previous night." She also testified about her response, saying she asked Appellant if he was going to file a report and he said no.

Appellant's daughter confirmed on cross examination Appellant texted her the morning of November 12 saying: "Good morning. Call me when you get this. Your brother ain't at the house." Also during cross examination, the State read, without objection, a text message exchange which partially follows:

Appellant: "Normal number of weeks pregnant, 40."

Appellant's daughter: "Why . . . It's 40 weeks."

Appellant: "Just thinking about something that happened over 25 years ago. That's all."

---

[2] During questioning by investigators, Appellant was asked if his relationship with his girlfriend had anything to do with him killing [Victim] and he said maybe."

Appellant's daughter: "With [Victim] or another kid?"

Appellant: "Why does it matter? It's nothing. You all have a good day."

Appellant's daughter: "Obviously it is [because] you're asking about it."

Appellant: "Just happened to think about. That's all. Too much time on my hands, I guess."

Additionally, on direct examination, defense counsel elicited testimony from Appellant's daughter that Appellant talked to her about his questions concerning whether Victim was his son or someone else's.

## ISSUE ON APPEAL

Did the trial judge err in admitting text messages as a business records exception to hearsay under Rule 803(6), SCRE?

## STANDARD OF REVIEW

"In criminal cases, the appellate court sits to review errors of law only." *State v. Washington*, 379 S.C. 120, 123, 665 S.E.2d 602, 604 (2008). "A ruling on the admissibility of evidence is within the sound discretion of the trial court and will not be reversed absent an abuse of discretion." *Id.* at 123-24, 665 S.E.2d at 604. "The improper admission of hearsay is reversible error only when the admission causes prejudice." *State v. Weston*, 367 S.C. 279, 288, 625 S.E.2d 641, 646 (2006).

## LAW / ANALYSIS

"The rule against hearsay prohibits the admission of evidence of an out-of-court statement to prove the truth of the matter asserted unless an exception to the rule applies." *Fowler v. Nationwide Mut. Fire Ins. Co.*, 410 S.C. 403, 411, 764 S.E.2d 249, 253 (Ct. App. 2014); *see also* Rule 802, SCRE ("Hearsay is not admissible except as provided by these rules or by other rules prescribed by the Supreme Court of this State or by statute.").

Rule 803(6), SCRE provides an exception to the rule against hearsay testimony as follows:

The following are not excluded by the hearsay rule, even though the declarant is available as a witness:

Records of Regularly Conducted Activity. A memorandum, report, record, or data compilation, in any form, of acts, events, conditions, or diagnoses, made at or near the time by, or from information transmitted by, a person with knowledge, if kept in the course of a regularly conducted business activity, and if it was the regular practice of that business activity to make the memorandum, report, record, or data compilation, all as shown by the testimony of the custodian or other qualified witness, unless the source of information or the method or circumstances of preparation indicate lack of trustworthiness; *provided, however,* that subjective opinions and judgments found in business records are not admissible. The term "business" as used in this subsection includes business, institution, association, profession, occupation, and calling of every kind, whether or not conducted for profit.

*See also* S.C. Code Ann. § 19-5-510 (2014) ("A record of an act, condition or event shall, insofar as relevant, be competent evidence if the custodian or other qualified witness testifies to its identity and the mode of its preparation, and if it was made in the regular course of business, at or near the time of the act, condition or event and if, in the opinion of the court, the sources of information, method and time of preparation were such as to justify its admission."); *Ex parte Dep't of Health & Envtl. Control*, 350 S.C. 243, 249-50, 565 S.E.2d 293, 297 (2002) (explaining business records are admissible under Rule 803(6) and section 19-5-510 "as long[] as they are (1) prepared near the time of the event recorded; (2) prepared by someone with or from information transmitted by a person with knowledge; (3) prepared in the regular course of business; (4) identified by a qualified witness who can testify regarding the mode of preparation of the record; and (5) found to be trustworthy by the court").

As to the business records exception in the case before us, the custodian testified fully as to the methods used by Verizon to keep a data compilation of all text messages in the Verizon system. There was evidence before the trial court that identified the cell phone numbers of Appellant and the other relevant parties involved. The Custodian stated the texts were kept in the course of Verizon's

regularly conducted business activity. The Custodian's testimony was sufficient to allow the trial court to find the *record of transmission* of the texts being sent and received (cell tower information, date, time, cell phone numbers, etc.) was admissible as a business record under Rule 803(6), SCRE.

However, Appellant does not contest that a record of text message data to and from Appellant compiled by Verizon would qualify as a business record. Appellant argues that the content of the texts themselves do not qualify as business records because the content was made by individuals who were not part of Verizon and the content contains hearsay on hearsay. Appellant argues that the content of these texts is severable from a mere record of their existence.

The United States Supreme Court has noted cell phones "are now such a pervasive and insistent part of daily life that the proverbial visitor from Mars might conclude they were an important feature of human anatomy." *Riley v. California*, 134 S.Ct. 2473, 2484 (2014). Text messaging has quickly become a common part of daily life for many people. As for text messages being admitted as business records, the trial court noted this is a "new area[] of the law in evidence and exceptions."[3]

The United States Supreme Court has explained business records are "created for the administration of an entity's affairs." *Melendez-Diaz v. Massachusetts*, 557 U.S. 305, 324 (2009). Although not in the context of text messages, the United States Court of Appeals for the Fifth Circuit stated the following in *Wilson v. Zapata Off-Shore Co.*, 939 F.2d 260, 271 (5th Cir. 1991) (internal citations omitted):

> Double hearsay in the context of a business record exists when the record is prepared by an employee with information supplied by another person. If both the source and the recorder of the information, as well as every other participant in the chain producing the record, are acting in the regular course of business, the multiple hearsay is excused by Rule 803(6). However, if the source of the information is an outsider . . . Rule 803(6) does not, by itself, permit the admission of the business

---

[3] While it is a new area, it is a natural progression in the area of transmittal of messages. *See Welsh v. W. Union Tel. Co.*, 207 S.C. 102, 108, 34 S.E.2d 398, 400 (1945) ("It is likewise patent that the [telegraphic] message involves a business transaction as distinguished from a social or personal message.").

record. The outsider's statement must fall within another hearsay exception to be admissible because it does not have the presumption of accuracy that statements made during the regular course of business have.

The United States Court of Appeals for the Tenth Circuit has also considered the reliability of business records involving double hearsay. *See United States v. Ary*, 518 F.3d 775, 787 (10th Cir. 2008) ("The essential component of the business records exception is that each actor in the chain of information is under a business duty or compulsion to provide accurate information. If any person in the process is not acting in the regular course of business, then an essential link in the trustworthiness chain fails[.]" (internal quotations omitted)).

We are hard pressed to find, as the State would have us find, that the contents of all authenticated text messages are admissible as a business record. Here, the content of the text messages was prepared by parties not acting in the regular course of any business, and was prepared by outsiders not acting in a "calling" of any "kind." The content of the text messages was not prepared in the administration of an entity's affairs. Those text message statements are thereby not lent the same presumption of accuracy accorded to statements made during the regular course of business. While we find the trial court improperly admitted Exhibit 98 as a business record under Rule 803(6), we nonetheless find no reversible error.[4]

"'Hearsay' is a statement, other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted." Rule 801(c), SCRE. "A statement is not hearsay if . . . [t]he statement is offered against a party and is . . . the party's own statement in either an individual or representative capacity." Rule 801(d)(2)(A), SCRE. "As a general rule, statements or declarations made by one accused of a crime are admissible against him." *State v. Beck*, 342 S.C. 129, 134, 536 S.E.2d 679, 682 (2000) (quoting *State v. Plyler*, 275 S.C. 291, 295, 270 S.E.2d 126, 128 (1980)). "Of course, such evidence must meet the threshold test of admissibility, i.e., relevance." *Beck* at 134, 536 S.E.2d at 682.

---

[4] We note Appellant has not challenged the admissibility of the text messages on authenticity grounds. *See* Rule 901(a), SCRE ("The requirement of authentication or identification as a condition precedent to admissibility is satisfied by evidence sufficient to support a finding that the matter in question is what its proponent claims.").

Generally, all relevant evidence is admissible. Rule 402, SCRE; *State v. Saltz*, 346 S.C. 114, 127, 551 S.E.2d 240, 247 (2001). Relevant evidence is evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence. Rule 401, SCRE. Relevant evidence may be excluded where "its probative value is substantially outweighed by the danger of unfair prejudice." *Saltz* 346 S.C. at 127, 551 S.E.2d at 247 (quoting Rule 403, SCRE).

Appellant claims the texts are unduly prejudicial and do not fall within another exception to the hearsay rule. We find most, if not all, of the complained of text messages admissible as they are not hearsay under Rule 801(d)(2)(A), SCRE. We further find them to be relevant. These statements show that three days before the shooting Appellant was angry with Victim, stating "his ass is mine." One day before the shooting Appellant was questioning Victim's paternity. Also one day before the shooting, Appellant told his girlfriend that the "problem" of Victim was "solved." These text statements by Appellant are substantially more probative than prejudicial, are relevant to the element of premeditation, and are admissible under Rule 801(d)(2)(A). Additionally, we note, though denoted "Admission by Party-Opponent", the text of Rule 801(d)(2)(A) provides a party's own statement is not hearsay if offered against him at trial. *Beck* does not require a declaration by an accused be a specific admission of guilt to be admissible, but only that it be relevant. Thus, regardless of whether they could be construed as admissions of guilt, the text messages were admissible under the unambiguous provision of Rule 801(d)(2)(A) because they were statements made by Appellant, a criminal defendant, in his individual capacity.

Further, the majority of the specific text messages complained about by Appellant were cumulative to other unobjected to testimony. Specifically, Appellant's girlfriend testified concerning the text communications between her and Appellant regarding Victim interfering with her son's case, Appellant stating that he was mad, and Appellant saying that Victim's "ass was his." The girlfriend also testified she received a text from Appellant on the morning of November 11, asking if the reason she was not talking to him was because of what Victim and Victim's fiancée said, and declaring "that problem was solved." As to testimony from the Custodian regarding a text to Victim's fiancée the morning following the shooting asking if she had seen Victim, the fiancée testified she received such a text from Appellant around 5:45 that morning. Further, Appellant's daughter testified regarding the text from Appellant at 4:55 a.m. stating that Victim had not come home. Additionally, defense counsel elicited testimony from Appellant's daughter concerning Appellant making comments to her questioning Victim's paternity.

Moreover, many of the texts sent by Appellant are not hearsay because they were not offered for the truth of the matter asserted. *See State v. Sims*, 304 S.C. 409, 420, 405 S.E.2d 377, 383 (1991) ("Evidence is not hearsay unless it is an out of court statement offered to prove the truth of the matter asserted."); *R & G Constr., Inc. v. Lowcountry Reg'l Transp. Auth.*, 343 S.C. 424, 439, 540 S.E.2d 113, 121 (Ct. App. 2000) ("A statement that is not offered to prove the truth of the matter asserted should not be excluded as hearsay."). The texts from other parties in response to Appellant that were testified to in court were also not offered for the truth of the matter asserted and are not hearsay.

As to the texts from Exhibit 98 that were not otherwise testified to by witnesses and were erroneously admitted as business records, we find Appellant was not prejudiced by their admission. Exhibit 98 contained many text messages pertaining to everyday life that were not prejudicial in any way. Further, in the absence of Exhibit 98 (including the text message to Appellant's ex-wife questioning Victim's paternity) the evidence is still sufficient to allow the jury to reach a verdict of murder. From the testimony of Appellant's girlfriend, Appellant's daughter, and Victim's fiancée, the jury could have concluded Appellant considered murdering Victim three days before the shooting and attempted to cover up the murder afterwards. The same professions of love to his girlfriend in the text messages from Appellant were also found in the letter read in court. The text message evidence was cumulative to testimony of these witnesses. *See State v. Brockmeyer*, 406 S.C. 324, 356, 751 S.E.2d 645, 662 (2013) ("Because the improper admission of hearsay constitutes reversible error only when it results in prejudice, it is our view [appellant] failed to show he was prejudiced, and thus, has failed to show reversible error."); *State v. Byers*, 392 S.C. 438, 444, 710 S.E.2d 55, 58 (2011) ("To warrant reversal based on the wrongful admission of evidence, the complaining party must prove resulting prejudice. Prejudice occurs when there is reasonable probability the wrongly admitted evidence influenced the jury's verdict." (internal citation omitted)); *State v. Weston*, 367 S.C. 279, 288, 625 S.E.2d 641, 646 (2006) ("The improper admission of hearsay is reversible error only when the admission causes prejudice."); *State v. Hendricks*, 408 S.C. 525, 535-536, 759 S.E.2d 434, 439-440 (Ct. App. 2014) (explaining the admission of a hearsay statement did not prejudice the appellant because the corroboration the appellant contended was improperly achieved by the hearsay statement had already been properly accomplished by live testimony); *State v. Garner*, 389 S.C. 61, 67-

68, 697 S.E.2d 615, 618 (Ct. App. 2010) ("Improper admission of hearsay testimony constitutes reversible error only when the admission causes prejudice. Such error is deemed harmless when it could not have reasonably affected the result of the trial, and an appellate court will not set aside a conviction for such insubstantial errors." (internal quotation omitted)).

**CONCLUSION**

The trial court erred in admitting Exhibit 98 as a business record under Rule 803(6), SCRE. However, we find the text messages testified to were otherwise properly admitted, and any error in admission of the remainder of the text messages was cumulative and/or not prejudicial. Appellant's convictions are

**AFFIRMED.**

**LOCKEMY, C.J., and THOMAS, J., concur.**